**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MIRIAM FLORES, individually and
as a parent of Miriam Flores,
minor child; ROSA RZESLAWSKI,
individually and as a parent of
Mario Rzeslawski, minor child,
              *Plaintiffs-Appellees,*

              v.

STATE OF ARIZONA and the ARIZONA
STATE BOARD OF EDUCATION, and
its individual members in their
official capacities,
              *Defendants-Appellees,*

THOMAS C. HORNE, Superintendent
of Public Instruction,
              *Defendant-Appellant,*

              and

SPEAKER OF THE ARIZONA HOUSE OF
REPRESENTATIVES and PRESIDENT OF
THE ARIZONA SENATE,
              *Intervenors.*

No. 07-15603

D.C. No.
CV-92-00596-RCC

MIRIAM FLORES, individually and
as a parent of Miriam Flores,
minor child; ROSA RZESLAWSKI,
individually and as a parent of
Mario Rzeslawski, minor child,
                 *Plaintiffs-Appellees,*

                 v.

SPEAKER OF THE ARIZONA HOUSE OF
REPRESENTATIVES and PRESIDENT OF
THE ARIZONA SENATE,
                 *Intervenors-Appellants,*

                 and

STATE OF ARIZONA and the ARIZONA
STATE BOARD OF EDUCATION, and
its individual members in their
official capacities, THOMAS C.
HORNE, Superintendent of Public
Instruction,
                 *Defendants.*

No. 07-15605

D.C. No.
CV-92-00596-RCC

OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
December 4, 2007—San Francisco, California

Filed February 22, 2008

Before: Betty B. Fletcher, Marsha S. Berzon, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

David J. Cantelme (argued) and D. Aaron Brown, of Cantelme & Brown, P.L.C., for intervenors-appellants Speaker of the Arizona House of Representatives and President of the Arizona Senate.

Eric J. Bistrow (argued), of Burch & Cracchiolo, P.A., for defendant-appellant Thomas C. Horne, Superintendent of Public Instruction of the State of Arizona.

Timothy M. Hogan (argued) and Joy E. Herr-Cardillo, of the Arizona Center for Law in the Public Interest, for plaintiffs-appellees Miriam Flores et al.

José A. Cárdenas (argued), Lynne C. Adams, David D. Garner, and Kimberly A. Demarchi, of Lewis & Roca LLP, and Terry Goddard, Attorney General of the State of Arizona, Mary O'Grady, Solicitor General of the State of Arizona, and Susan P. Segal, Assistant Attorney General of the State of Arizona, for defendants-appellees State of Arizona and Arizona State Board of Education.

John C. Richardson and Shefali Milczarek-Desai, of DeConcini McDonald Yetwin & Lacy, P.C., for *amicus curiae* Arizona School Boards Association, Tucson Unified School District, Mesa Unified School District, Sunnyside Unified School District, and Phoenix Union High School District.

## OPINION

BERZON, Circuit Judge:

On January 24, 2000, the District Court for the District of Arizona ruled that Arizona was violating the Equal Educational Opportunity Act of 1974, 20 U.S.C. §§ 1701 *et seq.* ("EEOA"), because the state's funding for English language instruction for non-native speakers was "not reasonably calculated to effectively implement the . . . educational theory which" the state had approved. *Flores v. Arizona*, 172 F. Supp.2d 1225, 1239 ("*Flores II*") (D. Ariz. 2000). Eight years later, Arizona has still not satisfied the terms of that judgment, nor complied with the bulk of the injunctions entered against it as a result of that ruling. Although Arizona and the Arizona Board of Education acknowledge that the state remains out of compliance and do not seek to vacate the judgment or the injunctive orders, the Arizona Superintendent of Public Instruction, the Speaker of the Arizona House of Representatives, and the President of the Arizona Senate moved for relief from judgment.[1] We affirm the district court's denial of relief.

---

[1] The Arizona School Boards Association, Tucson Unified School District, Mesa Unified School District, Sunnyside Unified School District, and Phoenix Union High School District filed an amicus brief supporting Arizona, the Board of Education, and the plaintiffs. They emphasize the many pedagogical challenges districts face in attempting to educate students who are not fluent in English and the substantial resource costs those hurdles create. In their view, "Arizona school districts have performed an admirable job of educating [English language learner] students despite being grossly under-funded by the State. School districts are already

## I. BACKGROUND

It has been more than fifteen years since the initial complaint in this action was filed and eight years since the final judgment on liability issued. The post-judgment relief process has been arduous, with Arizona moving forward, to the considerable degree it has, largely in response to a consent decree resulting from this litigation and a series of post judgment relief orders. Over this long period, local and national conditions have shifted in significant ways. The moving parties contend they have done so sufficiently as to warrant relief from judgment, even though Arizona has never complied with the specific terms of the present injunction against it. Explaining why that argument fails requires rehearsing the history of this case. We do so here, beginning with the complaint and Declaratory Judgment, moving through the intermediate post-judgment orders, and then discussing in detail the proceedings leading up to this case, which were triggered by a new state funding statute and resulted in an eight-day evidentiary hearing.

### A. The EEOA and the Complaint

Nogales is a small city along the Mexican border in southern Arizona. In 1992, when this suit began, the population of the Nogales Unified School District ("NUSD") was almost entirely Hispanic; that is still so. Most of its approximately 6,000 students come from homes where Spanish is the first language. These students are distributed among six elementary schools, two middle schools, one high school, and one

stretched to their limits both economically and in terms of morale and personnel. They will continue to struggle to provide quality [programs for such students] without additional assistance and resources from the State." They further note that "Arizona school districts cannot divert general education funding to . . . programs [for such students] without seriously crippling school districts' ability to provide all other aspects of a public education."

alternative high school. The great majority of the district's students are classified as English language learners ("ELL") for at least some portion of their academic careers. In 2006, for instance, thirty percent of the students were in ELL programs and an additional sixty percent had been in such programs. Although Arizona's theory of ELL instruction has changed over the years, the enormous importance of such programs to students and parents in Nogales has not.

ELL students and parents in Nogales (we refer to them as "Flores," after class representative Miriam Flores), were faced with serious inadequacies in ELL instruction and sued to correct them. The suit proceeded as a class action, with the class defined as "all minority 'at risk' and limited English proficient children now or hereafter, enrolled in Nogales Unified School District . . . , as well as their parents and guardians."

Flores' second amended complaint, filed November 29, 1996, primarily alleged that the "State has failed to provide financial and other resources necessary for adequate implementation of mandatory [ELL] programs by public school districts in Arizona," because "[t]he cost of [ELL] instruction complying with federally prescribed state mandates far exceeds the only financial assistance the State theoretically provides school districts for such purposes." As a result, Flores contended, Arizona, the state Superintendent, and the state Board of Education violated the EEOA.

The relevant portion of the EEOA provides:

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by —
>
> . . . (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703. This provision of the EEOA was intended to remedy the linguistic discrimination identified by *Lau v. Nichols*, 414 U.S. 563 (1974), in which the Supreme Court held that failing to provide for the needs of non-English speaking students "is to make a mockery of public education," rendering classroom experiences for these children "wholly incomprehensible and in no way meaningful." *Id.* at 566; *see also Castaneda v. Pickard*, 648 F.2d 989, 1008 (5th Cir. 1981) (noting that the EEOA codifies the "essential holding of *Lau*, *i.e.,* that schools are not free to ignore the need of limited English speaking children for language assistance to enable them to participate in the instructional program of the district.").[2]

Flores alleged that such needs were not being met in Arizona. She charged Arizona with "administer[ing] a school finance scheme that is just sufficient to let less distressed, predominantly Anglo districts impart State-mandated essential skills to their mainstream student bodies . . . but that does not and will not enable NUSD or similarly situated districts to impart the same State-mandated essential skills to decisively minority enrollments requiring expanded compensatory programs, smaller class sizes and further efforts of like nature in order to acquire them."

Flores' complaint was premised on the EEOA analytic framework provided by the Fifth Circuit in *Castaneda*. *See* 648 F.2d at 1009-10; *see also Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1041-42 (7th Cir. 1987) (applying the *Castaneda* analysis). The *Castaneda* framework is three-fold:

---

[2]The EEOA contains an express private right of action, 20 U.S.C. § 1706, under which this suit proceeds. *See Flores v. Arizona*, 48 F. Supp. 2d 937, 940 ("*Flores I*") (D. Ariz. 1999) (holding that the plaintiffs could proceed under § 1706). We have held that § 1706 abrogates state sovereign immunity. *Los Angeles NAACP v. Los Angeles Unified School Dist.*, 714 F.2d 946, 950-51 (9th Cir. 1983); *see also Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1037-38 (7th Cir. 1987) (same). Arizona does not contend otherwise.

First, courts must be satisfied that the "school system is purs-[uing] a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy." *Castaneda,* 648 F.2d at 1009. Second, "the programs and practices actually used by a school system [must be] reasonably calculated to implement effectively the educational theory adopted by the school." *Id.* at 1010. There must, in other words, be sufficient "practices, resources and personnel . . . to transform the theory into reality." *Id.* Third, even if theory is sound and resources are adequate, the program must be borne out by practical results. *Id.* Flores alleged, consistent with *Castaneda* step two, that Arizona had "failed to provide financial and other resources necessary for adequate implementation" of its ELL programs.

## B. The Declaratory Judgment and Arizona's School Funding System

After lengthy pre-trial proceedings and a bench trial, the district court on January 24, 2000, held that Arizona was in violation of the EEOA and granted declaratory judgment in Flores' favor.[3] *See Flores II*, 172 F. Supp. 2d at 1239. Of the many issues raised in Flores' complaint, only one EEOA issue was decided by the court: "[W]hether or not Defendants' [sic] adequately fund and oversee the *Lau* program in NUSD . . . ."[4] *Id.* at 1226. The rest of the EEOA violations originally alleged, including failures adequately to evaluate and monitor ELL students, to provide tutoring and other forms of compensatory instruction, and to design successful ELL programming, were covered by a consent decree approved by the district court on July 31, 2000. *See id.*

---

[3]The earlier proceedings, which involved changes of counsel on both sides and various other procedural hurdles and delays, are summarized in *Flores I*, 48 F. Supp. 2d at 943-46.

[4]Because 20 U.S.C. § 1703(f) codifies the central holding of *Lau*, ELL programs are sometimes referred to as "*Lau* programs."

The particulars of Arizona's school funding system are therefore at the heart of this case. We pause to describe them here.

Consistent with Article XI, § 1 of the Arizona Constitution, school funding in Arizona is designed to be essentially equal across districts, despite differences in local property values. *See Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806, 811-16 ("*Roosevelt I*") (Ariz. 1994).[5] To ensure equality, the state calculates the maximum support level a district may spend, referred to as the revenue control limit, *see* ARIZ. REV. STAT. § 15-947, and then pays the difference between that level and the amount the district can raise by levying a state-mandated tax rate against property in its area, *see* ARIZ. REV. STAT. § 15-971. Thus, regardless of the local tax base, the amount each district can spend per pupil is roughly equalized statewide, by first setting a maximum spending level and then making up the gap between local tax revenues and that level with state funds.[6]

The revenue control limit, and hence the district support level, is calculated by adding together funds designated for transporting students to school, *see* ARIZ. REV. STAT. § 15-945, and "base support" funds, *see* ARIZ. REV. STAT. §§ 15-943, 944. It is these base funds with which we are primarily concerned.[7] These funds are unrestricted — school districts may spend them essentially as needed — and do not appear to have been calibrated "to any minimum amount necessary

---

[5]Article XI, § 1 provides in pertinent part that "[t]he Legislature shall enact such laws as shall provide for the establishment and maintenance of a *general and uniform* public school system." (Emphasis added).

[6]School districts may also try to pass ballot measures, called "overrides," to raise county taxes and so secure funds above the revenue control limit. *See* ARIZ. REV. STAT. § 15-481.

[7]These funds, along with other federal, state and county funds, including funds provided to support ELL students, are sometimes referred to as "maintenance and operation" or "M & O" funds. *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1041 (9th Cir. 2003).

for a basic education." *See Roosevelt I*, 877 P.2d at 810. Nonetheless, they represent the core funding provided for such an education.

Funding allocations are made by using a weighting system: A per pupil weighted amount of funding is calculated by multiplying a "support level weight" (which varies by district type and size and by the student's grade level) by a statewide baseline amount. *See* ARIZ. REV. STAT. §§ 15-943(1)(a)-(2)(a) (weights), 15-901(B)(2) (baseline). For the 2006-2007 school year, for instance, the statewide baseline amount was $3,133.53. ARIZ. REV. STAT. § 15-901(B)(2)(a). The support level weight for a typical student in grade eight in most school districts is 1.158, ARIZ. REV. STAT. § 15-943(2)(a), so a district could spend $3,628.63[8] to support that student in 2006-2007.

Not all students are "typical," of course. Some have special needs which impose additional, incremental costs. ELL students, for example, naturally require additional support. Arizona's funding formula provides for these incremental costs through an additional "Group B" weighting system which adds additional funding for various student groups, including ELL students. *See* ARIZ. REV. STAT. § 15-943(2)(b). In 2006-07, for instance, the Group B weight for ELL students was 0.115, so a district received an *additional* $360.36[9] to cover the ELL component of that student's education, on top of the base level $3,628.63 provided for each pupil.

The core assumption of Arizona's funding formula, then, is that ELL students impose *incremental* costs on a district, above the base level funding allocation. So, while all of the funding (base level and Group B weights) is allocated to the district as a block grant, a district that spends more on ELL

---

[8]This figure is the product of the support level weight (1.158) multiplied by the baseline amount ($3,133.53).

[9]This figure is the product of the Group B weight (0.115) multiplied by the baseline amount ($3,133.53).

incremental costs than allocated is necessarily spending less on basic educational needs per pupil.

Taking this framework as a given, the district court in its 2000 declaratory judgment opinion inquired whether Arizona's funding specifically for ELL students — the Group B weights — actually covered the incremental costs of ELL programming. The court found that it did not. *Flores II*, 172 F. Supp.2d at 1239.

This finding was well supported. Arizona had conducted a cost study in 1987-88 which determined that school districts were spending about $450 (in 1988 dollars, unadjusted for inflation) per ELL student. *Id.* at 1228. This study was seriously methodologically flawed; it did not, for instance, determine what districts *should* be spending. But even by the study's flawed measure, Arizona's ELL funding was inadequate on a statewide basis. Twelve years after the study, the district court found, Arizona's ELL Group B weight, 0.60, provided only about $150 per student. *Id.* at 1238-39.

That this support was inadequate to live up to Arizona's EEOA obligations to its school districts and their students was supported by several examples of resource-linked ELL program deficiencies in NUSD, including:

    1) too many students in a class room,

    2) not enough class rooms,

    3) not enough qualified teachers, including teachers to teach [English as a Second Language] and bilingual teachers to teach content area studies,

    4) not enough teacher aids,

    5) an inadequate tutoring program, and

6) insufficient teaching materials for both [English as a Second Language] and content area courses.

*Id.* at 1239.

In short, Arizona's "minimum base level for funding *Lau* programs [was] arbitrary and capricious and [bore] no relation to the actual funding needed to ensure that [ELL] students in NUSD are achieving mastery of its specified 'essential skills.' " *Id.* In particular, the court held, the ELL Group B weight appropriation was "not reasonably calculated to effectively implement" the ELL programs, and Arizona had, therefore, "failed to follow through with . . . resources . . . necessary to transform theory into reality," as the *Castaneda* framework requires.[10] *Id.; see Castaneda*, 648 F.2d at 1010.

## C.  Post-Judgment Relief and Arizona's ELL Programs

The judgment was not appealed. Nonetheless, Arizona did not take action to eliminate the violations found in the Declaratory Judgment. Instead, the state legislature defeated several attempts to commission an adequate study of ELL costs that would enable it to set appropriate ELL funding levels.

In October of 2000, ten months after the issuance of the Declaratory Judgment, the district court ordered Arizona to "prepare a cost study to establish the proper appropriation to effectively implement" ELL programs. *Flores v. Arizona*, 160 F. Supp. 2d 1043, 1047 ("*Flores III*") (D. Ariz. 2000). Such a study was critical, the court indicated, because "as a matter of law the State's minimum base level for funding *Lau* pro-

---

[10]The district court was aware that base support funds could be diverted to ELL students if the target Group B weight funding is inadequate and a district so chooses. *Flores II*, 172 F. Supp. 2d at 1229. Because base level funds support typical students, the district court focused on the Group B weights, *see id.* at 1238, which are, again, the amount that Arizona projects will be necessary to spend *in addition* to the base level funds to meet the special needs of ELL students.

grams bears no relation to the actual funding needed to ensure that [ELL] students are achieving mastery of the State's specified 'essential skills.' " *Id.* at 1044. This injunction was not appealed either.

Shortly after the injunction issued, in November 2000, Arizona voters approved two propositions that altered Arizona's school funding and ELL programs. Proposition 203 largely abolished bilingual education, replacing it with sheltered English immersion, a teaching method "in which nearly all classroom instruction is in English but with the curriculum and presentation designed for children who are learning the language." Ariz. Rev. Stat. § 15-751(5). Proposition 301 increased school funding generally in Arizona through a sales tax increase. *See* Ariz. Rev. Stat. § 15-901.01. Prop. 301 funding is available for many purposes but is not directed specifically towards ELL programs. *See* Ariz. Rev. Stat. § 42-5029(E)(1)-(10).

Meanwhile, as ordered, Arizona commissioned a cost study (we refer to it as the "SjobergEvashnek study," after the consulting group that largely directed it). The final study, however, proved to be a disappointment. It did not estimate the incremental costs of EEOA compliance, but instead reported on what several districts nationwide were spending. The study reported widely variable incremental costs for various ELL programs, ranging from about $185 to $3,000 per ELL student. It also found that NUSD was spending $331.60 in incremental costs per pupil, while noting that the NUSD program might not "fully address the unique and extraordinary needs of [NUSD's ELL] population."

Some additional guidance came from a study conducted by the staff of several Democratic members of the legislature (the "Staffers' study"), also released in 2001. Aggregating data from other states and from Arizona, the Staffers' study estimated $1527 in incremental costs per student would be required for EEOA compliant programs — a number, it noted,

which was generally consistent with the experience of other states.

Arizona did not act on either study. After Flores again moved for post-judgment relief, the court, on June 25, 2001, restated its holding that "as a matter of law the State's minimum base level for funding *Lau* programs" was not rationally linked to "funding needed to ensure that [ELL] students are achieving mastery of the State's specified 'essential skills.' " *Flores v. Arizona*, No. CV-92-596, 2001 WL 1028369 at *1 ("*Flores IV*") (D. Ariz. 2001). It ordered Arizona to provide funding that "shall bear a rational relationship to the actual funding needed" by no later than January 31, 2002. *Id.* at *2. This injunction, too, was not appealed.

The legislature responded by enacting HB 2010 on December 19, 2001. That law increased the ELL Group B weight to 0.115, which generated, at that time, about $339.61 per student, roughly the amount that NUSD was recorded as spending in the SjobergEvashnek study. HB 2010 also provided funds for a more comprehensive cost study than had been done previously. Contending that HB 2010 was not adequate, Flores again moved for post-judgment relief.

Initially, the district court agreed with Flores. It held, in an order issued on April 8, 2002, that the $339.61 in base level funding was not adequate because it was based on NUSD's *actual* spending (as of 2001), which generated "the very program that this Court's Declaratory Judgment held to be deficient." *Flores v. Arizona*, No. CV-92-596 at 3 ("*Flores V*") (D. Ariz. 2002). A few months later, however, the court reconsidered, on Arizona's motion, and held that HB 2010's funding levels were adequate "as an interim measure pending further study and review," including the cost study funded by HB 2010. *Flores v. Arizona*, No. CV-92-596 at 1-2 ("*Flores*

*VI*") (D. Ariz. June 12, 2002). The order was not appealed, and three years passed.[11]

Again, the legislature gathered some data and, again, it did not act upon the data it received. As part of HB 2010, the legislature commissioned a detailed cost study from the National Conference of State Legislatures (the "NCSL study"). NCSL submitted a first draft in August 2004 and a second draft in February 2005, upon which we rely. The study used two approaches: A survey sent to Arizona school districts to determine then-current ELL program spending and two expert panels, one of state and one of national experts, convened to estimate the costs of EEOA-compliant ELL programs.

The school district survey was hampered by a small response rate — only seven of the sixteen surveyed districts provided data. NCSL noted the problem but analyzed the available data, which showed an average expenditure of $669.35 per pupil in incremental costs. NCSL cautioned that this data was limited and of questionable quality, noting that the cost figure might be "somewhat understated."

Expert estimates of appropriate (rather than actual) spending were significantly higher. The national expert panel recommended a range of spending, based on the degree of students' need for help and grade level from $1,026 per pupil for low-need students at the high school level to $2,571 for high-need elementary school students. The state expert panel recommended spending $1,785 in per pupil incremental costs in grades K-2 and $1,447 in grades 3-12.

---

[11]Among the events of those years was another general school funding increase. In November 2002, Arizona voters approved Proposition 202, which dedicated a portion of the state's share of Indian casino gambling proceeds to a school improvement fund for teacher compensation, class size reduction, dropout prevention, and instructional improvement programs. *See* ARIZ. REV. STAT. §§ 5-601.02(H)(3)(b)(I); 15-979. None of these monies are specifically directed to ELL programs.

Again, Arizona did not act to bring its system into line with either set of cost data. Again, Flores moved for post-judgment relief.[12] On January 28, 2005, the court set an April 30, 2005 deadline for Arizona to "appropriately and constitutionally fund[ ] the state's ELL programs taking into account the Court's previous orders." *Flores v. Arizona*, No. CV-92-596 at 5 ("*Flores VII*") (D. Ariz. 2005).

## D. The First Contempt Order and HB 2064

Arizona failed to act before the deadline. Flores moved for sanctions. On December 15, 2005, deploring the fact that "[t]housands of children who have now been impacted by the State's inadequate funding of ELL programs had yet to begin school when Plaintiffs filed this case," the court held that Arizona was in civil contempt. *Flores v. Arizona*, 405 F. Supp. 2d 1112, 1113, 1119 ("*Flores VIII*") (D. Ariz. 2005). It set a deadline of fifteen days after the start of the 2006 legislative session for compliance with its order, and imposed a schedule of fines that would begin to accrue if Arizona did not act and that were to be distributed to Arizona schools to support ELL students. *Id.* at 1120-21; *see also* Order re: Distribution of Fines, No. CV-92-596 (D. Ariz. March 16, 2006).

Arizona did not enact compliant legislation and accrued over $20 million in fines. Eventually, in the spring of 2006, Arizona Governor Janet Napolitano allowed HB 2064, the legislature's effort to create a permanent compliant funding system, to become law without her signature.[13]

HB 2064 is consistent with Arizona's "base costs plus Group B weights" approach to education funding, but

---

[12]Not long before this motion was filed, the litigation was transferred from Senior District Judge Alfredo C. Marquez, who had handled it from the outset, to District Judge Raner C. Collins.

[13]Governor Napolitano's statement on HB 2064 appears later in this opinion.

includes some additional ELL funds designed to cover incremental costs above Group B weight levels, although there are no guaranteed appropriations for these funds. Along with this funding structure, the statute provides for further statewide standardization of ELL programs, presumably in part to make it possible for the state more easily to monitor and assess the impact and use of allocated funds and the need for additional funds.

To drive the standardization process, HB 2064 creates the "Arizona English language learners task force" within the state Department of Education. *See* ARIZ. REV. STAT. § 15-756.01. The task force is "to develop and adopt research based models of structured English immersion programs for use by school districts and charter schools." *Id.* at § 15-756.01(C).[14] Each school district and charter school is to adopt one of the models or request a waiver. *See* ARIZ. REV. STAT. § 15-756.02. To aid in implementing the models, HB 2064 also creates an "Office of English language acquisition services," which is to develop guidelines for monitoring ELL students and programs, create teacher training programs, and provide other forms of technical assistance. *See* ARIZ. REV. STAT. §§ 15-756.07, 15-756.08. Finally, the state Board of Education is charged with developing a structured English immersion "endorsement" program for use in training and certifying Arizona's teachers. *See* ARIZ. REV. STAT. § 15-756.09.

The models, and ELL education generally, are funded by three mechanisms under HB 2064, representing significant potential increases in ELL funding but coming with significant limitations:

*First*, HB 2064 raises the Group B weight for ELL students

---

[14]The models are "limited to a regular school year and school day," *id.* at § 15-756.01(E), and do not provide guidance for after-school and summer school programs.

from 0.115 to 0.140, which corresponds to an increase from about $340 per student to about $450 per student. *See* HB 2064 § 6, to be codified at ARIZ. REV. STAT. § 15-943(2)(b).[15] There is, however, a significant cut-back as well: Unlike earlier Group B weight funding, under HB 2064 Group B "funding for the same ELL pupil shall not be provided for more than two fiscal years." HB 2064 § 6.

*Second*, HB 2064 establishes the "Arizona structured English immersion fund," which provides supplemental funds above the Group B weights to implement the models. *See* ARIZ. REV. STAT. § 15-756.04. Those funds come, however, with several restrictions. Like the Group B weights, they are limited to two years of availability for any one student. ARIZ. REV. STAT. § 15-756.01(J). And only "incremental costs" of the programs are funded, which are defined as those "in addition to the normal costs of conducting programs for English proficient students," *id.* at § 15-756.01(L), and which do not include "compensatory instruction." "Compensatory instruction" consists of "programs in addition to normal classroom instruction . . . [which] are limited to improving the english proficiency of current english language learners and pupils who were english language learners and who have been reclassified as english proficient within the previous two years." ARIZ. REV. STAT. at § 15-756.11(G).

In addition, the amount of money provided by the structured English immersion fund is offset by the following funding sources:

> 1. All federal title III monies and any other federal monies designated solely for the educational needs of english language learners.
>
> 2.  The portion of title I and title II A monies deter-

---

[15]As we note below, this increase is not yet in effect.

mined by the english language learner population as a percentage of the qualified population.

3.   The portion of impact aid monies determined by the english language learner population as a percentage of the qualified population. A school district or charter school shall only apply unexpended impact aid monies to english language learner programs after it has applied its impact aid monies for other allowable uses as permitted by state law.

4.   The portion of [monies the district may levy to further desegregation efforts pursuant to ARIZ. REV. STAT.] § 15-910 . . . determined by the english language learner population as a percentage of the qualified population.

5.   The ELL [Group B] weight . . . .

ARIZ. REV. STAT. § 15-756.01(I)(1)-(5). At the same time, HB 2064 provides that "[m]onies from the fund [are to be used] . . . to supplement existing programs for english language learners . . . . [and] shall not be used to supplant available monies used to pay for the normal costs of conducting programs for english proficient students." ARIZ. REV. STAT. § 15-756.04(F).

Importantly, there is no guaranteed legislative appropriation for the structured English immersion fund. Instead, after school districts and charter schools submit budget requests, the Department of Education is to verify and "collect all . . . [the] requests and submit them to the [Arizona] legislature for funding." ARIZ. REV. STAT. § 15-756.03(C). The legislature is not required to appropriate any monies to fund such requests.

*Third*, HB 2064 establishes the "statewide compensatory instruction fund" to be used for compensatory instruction only. *See* ARIZ. REV. STAT. § 15-756.11. These funds, too,

come with a caveat: They "shall not be used to supplant any federal, state or local monies, including desegregation monies . . . , used for compensatory instruction that [had been] budgeted for english language learners as of February 23, 2006." *Id.* at § 15-756.11(E). In other words, the state funds provided must not replace any funds already in use for the same purpose. The total amount of funding is also limited. Although the legislature appropriated $10 million for this program for the 2006-07 fiscal year, no further appropriations are required by the statute. HB 2064 § 9.

HB 2064 was for the most part immediately effective. School districts and charter schools, however, could not adopt the models until they were developed, which they now have been. Also, monies for the structured English immersion fund do not have to be appropriated and to this point have not been. Most importantly, the provisions associated with the Group B weight increase, require court approval. In this regard, HB 2064 provides:

> [The Group B weight increase and appropriation to fund it, along with the two-year cut-off] do not become effective unless the United States District [C]ourt for the [D]istrict of Arizona in the case of [*Flores v. State of Arizona*] issues an order that, by this act, the state has taken appropriate action to establish a program that addresses the orders in the case and, at least on an interim basis, the court will permit this act to be fully implemented to determine whether the resulting ELL plans and available funding to implement the plans bear a rational relationship to the cost of implementing appropriate language acquisition programs.

HB 2064 § 15(A).

Although Governor Napolitano allowed HB 2064 to become law, she did so without vouching for its compliance

with the 2005 court order or with the Declaratory Judgment. To the contrary, she announced that she was "convinced that getting this bill into court now is the most expeditious way ultimately to bring the state into compliance with federal law," and requested that the Attorney General move the court for expedited consideration of the law.[16]

---

[16]Governor Napolitano's statement on the matter provides, in relevant part:

> I received House Bill 2064, related to [ELL] programs. I have decided to allow the bill to become law without my signature so that we can move this dispute to a different forum and get a ruling from the *Flores* Court as to its sufficiency. After nine months of meetings and three vetoes, it is time to take this matter to a federal judge. I am convinced that getting this bill into court now is the most expeditious way ultimately to bring the state into compliance with federal law.
>
> . . . .
>
> Although I am allowing House Bill 2064 to become law without my signature, I do not believe this bill meets either the Court's multiple orders or our existing consent decree. It fails in a number of important ways, including but not limited to:
>
> • *Arbitrary Funding Level:* there is no reason to believe that the funding contained in House Bill 2064 bears any rational relationship to the actual cost of implementing a successful language acquisition program.
>
> • *Failure to Ensure Academic Accountability*: the point of teaching children to speak, read and write in English is to allow them to succeed academically and to ultimately become contributing members of the workforce. This bill cuts off funding to students after two years, regardless of their academic progress and does not ensure ELL students would even be able to pass AIMS [Arizona's achievement test].
>
> • *Failure to Determine Program Effectiveness:* rather than using respected experts to advise the state on best practices and the real costs of ELL instruction, House Bill 2064 instead creates a system by which political appointees with no required minimum qualifications make important educational policy decisions.
>
> • *Unwise Creation of a New Bureaucracy and Excess Paperwork:* the bill adds an extra layer of government and does not focus on long-term student success.

## E. The First Relief from Judgment Ruling and the Remand

By this point, six years after the Declaratory Judgment, the positions of the parties had shifted, with Arizona and the state Board of Education abandoning their defense of the suit and largely siding with Flores. As a result, when, on March 3, 2006, the state Attorney General moved on behalf of Arizona for the court to consider whether HB 2064 satisfied its order, he was arguing *against* Arizona's own law.

The Superintendent, however, maintained his position and was joined by the Speaker of the Arizona House of Representatives and the President of the Arizona Senate as intervenors (we refer to them as the "Legislative Intervenors"). Later that March, these parties moved to purge contempt and, in the alternative, for relief from judgment under Rule 60(b)(5). Their joint motion was based largely on HB 2064, which, they contended, "creates a plan for adequate funding of programs for [ELL students]," and brings Arizona into compliance.

The district court disagreed, ruling on April 25, 2006, that HB 2064 does not comply with its orders or with the Declaratory Judgment because the "Act does not [bear] any rational relationship to the cost of providing an ELL program . . . and it has added new hurdles to the mix." *Flores v. Arizona*, No. CV-92-596 at 3 ("*Flores IX*") (D. Ariz. 2006). The court held the Group B weight increase insufficient, and the two-year cut-off on most funds irrational. *Id.* at 7-8. The two new funds, moreover, were structured in ways that violated federal law. *Id.* at 4-7. The Superintendent and Legislative Interve-

---

- *Violation of Federal Supplanting Laws:* the bill requires ELL payments to school districts and charter schools to be reduced by the amount of federal monies they receive, in violation of federal law.

nors appealed both that order and the December 2005 contempt order.

On August 23, 2006, in an unpublished memorandum disposition, this court vacated both orders as well as the obligation to pay fines. *Flores v. Rzeslawski*, 204 Fed. App'x. 580 ("*Flores X*") (9th Cir. 2006). The court noted that "the landscape of educational funding has changed significantly" since 2000 and remanded for the district court to hold "an evidentiary hearing . . . regarding whether changed circumstances required modification of the original court order or otherwise had a bearing on the appropriate remedy." *Id.* at 582. The court made clear that it reached none of the other issues in the case. *Id.*

## F.   The Evidentiary Hearing

On remand, the district court held an eight-day hearing in January 2007. Testimony at the hearing focused on three broad areas: (1) HB 2064 and other changes in Arizona's ELL programming and funding; (2) conditions in NUSD; and (3) conditions in other school districts statewide. As the evidence adduced in the hearing is at the core of our inquiry today, we summarize it in some detail here.

### 1.   Statewide Changes

As is required by the *Flores* consent decree, Arizona has significantly improved its ELL infrastructure. It has also increased overall school funding and, to a lesser degree, ELL program-specific funding. Nonetheless, Arizona's 134,000 ELL students continue to lag behind statewide average test results for all students.

The new administrative structure created by HB 2064 augments Arizona's efforts to further improve and standardize ELL programs statewide. The state Department of Education holds regular seminars and training sessions and has devel-

oped monitoring protocols for school districts. State-developed proficiency standards for ELL students are used to evaluate programs and to identify problems. Arizona has also made efforts to standardize the testing used to classify children as ELL or English proficient.[17] Perhaps most importantly, after August 31, 2006, all classroom teachers, supervisors, principals, and superintendents are required to obtain an endorsement in ELL teaching methods. *See* ARIZ. REV. STAT. § 15-756.09; ARIZ. ADMIN. CODE R7-2-613(J).

Along with these ELL-specific structural changes, Arizona has increased overall school funding.[18] On an inflation-adjusted statewide basis, including all sources of funding, support for education has increased from $3,139 per pupil in 2000 to an estimated $3,570 per pupil in 2006. Adding in all county and local sources, funding has gone from $5,677 per pupil in 2000 to an estimated $6,412 per pupil in 2006. Finally, federal funding has increased. In 2000, the federal government provided an additional $526 per pupil; in 2006, it provided an estimated $953.[19]

---

[17]Before 2004, Arizona allowed districts to select among four different tests to decide when to "reclassify" students out of ELL programs into mainstream classes. Beginning in 2004, Arizona instituted the Stanford English Language Proficiency Assessment ("SELP"), which was in use from 2004 through 2006. SELP was generally regarded as too easy to pass, and reclassification rates increased measurably during its use. Arizona fine-tuned SELP, renaming it the Arizona English Language Learner Assessment ("AZELLA"), and has been using the new test since the fall of 2006. The transition from SELP to AZELLA appears to have measurably decreased reclassification rates. As a result of these shifts in testing methodology, ELL reclassification rates are not easily comparable over the years.

[18]Broader state efforts for at-risk children generally benefit some ELL students. These efforts include several funding streams for tutoring programs. In one tutoring program, 88% of ELL students were able to raise their scores by one achievement level in at least one subject area of Arizona's standardized academic achievement tests; 92% of non-ELL students in the same program so raised their scores.

[19]Arizona has also significantly increased spending on school physical plant needs, largely in response to another class-action suit. *See Roosevelt Elementary Sch. Dist. No. 66 v. Arizona*, 74 P.3d 258, 259-263 ("*Roosevelt II*") (Ariz. Ct. App. 2003).

Arizona's ELL-specific funding increases are associated with HB 2010 and HB 2064. At the hearing, two important points concerning HB 2064 emerged: First, none of the defense witnesses were able to establish what data, if any, the Group B weights are based upon. The weights do not appear to have been set with regard to any specific program costs, known or estimated. Second, Flores' expert on federal educational funding statutes, Thomas Fagan, testified that if the federal government concluded that HB 2064 was in violation of federal statutes, it could take significant enforcement actions, including a cut-off of some or all federal education funds.[20]

Despite Arizona's expanded ELL infrastructure and budget, ELL students still achieve below — and often far below — state average passage rates on Arizona's "AIMS" academic achievement test and fall below the minimum passage rates Arizona must meet to reach the "annual measurable objectives" required by the No Child Left Behind Act of 2001 ("NCLB"), Pub. L. No.107-110, 115 Stat. 1425, as test results from the 2004-05 and 2005-06 school years show.[21] *See* 20 U.S.C. § 6842 (federal standards).

These test results must be viewed with two significant caveats: First, because AIMS testing was not carried out in 2000, we do not know whether the performance of ELL students has improved relative to that time. Second, Arizona has changed the AIMS test itself, including altering the passing score, and has twice changed the system it uses for reclassifying ELL students — once at the beginning of the 2004-05 school year, and again at the start of the 2006-07 school year. Results for those students classified as ELL across those years are therefore not clearly comparable.

---

[20]We discuss these potential violations and their consequences below.

[21]Standardized tests do not, of course, provide a full measure of a school's successes and failures. Educational quality is too complex to be reflected in a single score. But test scores do provide us with at least a rough sense of relative performance, and so are useful here.

Due to these limitations, and to a general lack of longitudinal data on individual ELL students, we do not have data that conclusively demonstrates whether ELL programs ultimately succeed — that is, whether children pass through them rapidly and ultimately perform as well as non-ELL students. So, while the test results we next discuss are certainly troubling, it is important to understand the limits of their analytic reach.

With these caveats, we turn to the data. While Arizona students generally exceeded NCLB-mandated passage rates in math and reading, passing the AIMS test at rates of between 60% and 70%, ELL students were far behind. For example, among third graders, who pass the exam at a higher rate than older ELL students, only 50% passed the math exam in 2005 and just under 40% passed the reading exam in the same year.[22] The situation grows worse at higher grades — in 2005 only 33% of ELL tenth graders passed math and only 20% passed in 2006. In reading, only 30% passed in 2005 and that number fell to barely more than 10% in 2006. In neither year did ELL reading scores in any grade meet federal standards, and in 2006 ELL students' math test results for all grades also fell below the federal line at every grade level.

Nor do students necessarily leave ELL status rapidly. While all witnesses agreed that some students may swiftly become proficient in English, they also agreed that many will need ELL instruction for more than two years, and that some will still need help after three years of training.

In short, despite considerable efforts, and some improvements in outcomes, Arizona, as a state, does not appear to have turned the corner on ELL education performance.

---

[22]The passage rates for third graders in 2006 were even lower: 40% for math and 30% for reading.

## 2. Conditions in Nogales

The statewide achievement gap between ELL and non-ELL students is also present in NUSD, although the district has made significant strides since 2000. The improvements it has made, however, appear to be due largely to successful management rather than to adequate state funding for ELL programs. The record indicates that with adequate incremental ELL funding, the improvements could have been greater and this gap could have been further narrowed.

### a. Policy Changes and Test Results

Much of the improvement at NUSD stems from the successful management of Kelt Cooper, the district's Superintendent from 2000 to 2005. His successor, Dr. Guilermo Zamudio, has largely sustained Cooper's management policies. Despite the efforts of both superintendents, however, ELL students in Nogales continue to face serious challenges.

Cooper, who took the helm at about the time the Declaratory Judgment issued, adopted policies that ameliorated or eliminated many of the most glaring inadequacies discussed by the district court at that time. Cooper was able to reduce class sizes by enforcing restrictions on the district's open enrollment policy, significantly improving student/teacher ratios. In addition to lowering class sizes, Cooper improved teacher quality by changing the district's policies regarding the hiring of experienced teachers and by refusing to pay unqualified teachers who had been certified on an emergency basis as if they had the proper experience. He also fired many teachers' aides, many of whom were, he found, largely unqualified. Cooper also worked to institute district-wide student performance monitoring. Additionally, he pioneered a uniform system of textbook and curriculum planning, and he largely eliminated what had been a severe shortage of instructional materials by better accounting for and preserving available materials and by acquiring new materials when needed.

Using careful financial management and applying for "all funds available," Cooper was able to achieve his reforms with limited resources. His budget did, however, rise between two and four percent annually, partly because the district twice passed an override, that is, a county-wide tax measure.

Nonetheless, Cooper's successor, Dr. Zamudio, indicates that there are still significant resource constraints. Despite Cooper's recruitment efforts, Nogales still must rely on some long-term substitutes, rather than upon permanent teachers. Other teachers have been "emergency-certified" and so have not been trained according to Arizona's standards. NUSD's starting base pay of $28,500 per year, which is below the statewide average, makes it difficult to recruit the fully-qualified teachers that NUSD needs. The recruitment challenges mean that Dr. Zamudio has been unable to reduce student/teacher ratios further, to 15:1, which, both he and a defense expert testified, would significantly enhance English learning success. He would also like to be able to hire trained teacher's aides, who would be helpful in ELL programs, for the lower grades but has been unable to do so because of resource limitations.

The limits of NUSD's progress, even as it has improved its ELL programs, are apparent in the AIMS test results and reclassification test results introduced at the hearing, which show the same problems that appear in the statewide data. The test results, we caution, have the same limitations that we have discussed at the state level, and cannot be read unequivocally to demonstrate that ELL programs are failing in NUSD because we lack longitudinal data on the performance of student cohorts who began as ELL students and who may or may not have been reclassified. It is fair to say, however, that the indications provided by the test data largely do not point in positive directions.

For instance, while it is clear that NUSD has reclassified many students, it is not clear how much of this success can

be attributed to genuine academic progress and how much to changes in its classification methodology. During the 1999-2000 school year, there were 5,104 ELL students. The next year saw similar numbers, but between the 2001-02 and the 2003-04 school years, the number of such students hovered around 3800. Then, when Arizona implemented a new testing protocol (which was later concluded to be reclassifying too many students and replaced), the ELL population declined to about 3200 students in the 2004-05 school year and to 2474 the next year. In 2006-07 a new, reputedly more accurate and more difficult to pass test came into use, and Dr. Zamudio testified that he expects ELL student numbers to increase again.

Because of these shifts in reclassification methodology, the meaning of "ELL" changed over time. Comparison of AIMS test data for ELL students and non-ELL students over time are therefore not reliable. But, as some patterns persist, we can point to several general trends based on AIMS test results for the 2003-04, 2004-05, and 2005-06 school years.[23]

First, within NUSD, ELL students in lower grades are doing substantially better than ELL students in higher grades. In 2005-06, for instance, while only 27% of ELL third graders failed[24] math, 76% of ELL tenth graders failed. ELL third graders failed reading 37% of the time; 78% of ELL tenth graders failed. And 35% of ELL third graders failed writing, while 76% of ELL tenth graders failed.

---

[23]Although the patterns we describe are consistent from year to year, passage rates varied somewhat from year to year. They rose from 2003-04 to 2004-05 but fell again in 2005-06. One of the defense witnesses suggested that the high 2004-05 passage rates could be related to problems with the reclassification system.

[24]AIMS is graded on a four-part scale. Students may "fall far below" the passing score, "approach" but not meet the standard, "meet" the standard, or "exceed" the standard. When we refer to the percentage of students "failing," we mean those who either "fell far below" or only "approached" the state passing score.

Second, ELL students in NUSD generally do worse than the state average score for all students (ELL and non-ELL). Only students in the lower grades sometimes reached or beat the average. Older students are falling far behind. For tenth graders in 2005-06, for instance, only 36% failed math statewide, but 76% of ELL tenth graders in NUSD did. For reading, the tenth grade state failure rate was 29%, while the tenth grade ELL failure rate in NUSD was 78%. And for writing, the state tenth grade failure rate was 36% and the NUSD tenth grade ELL failure rate was 76%.

Third, within NUSD, ELL students are still falling behind the district average for all students. Again, the gap grows more pronounced in higher grades. In 2005-06 in third grade, ELL students failed math at a 27% rate, reading at a 37% rate, and writing at a 35% rate, rates that were not too much worse than the district averages of 22%, 29%, and 30%, respectively. By tenth grade, however, ELL students failed math at a 76% rate, reading at a 78% rate, and writing at a 76% rate, far worse than the district averages of 50%, 42%, and 39%, respectively.

The picture, then, is of relative success at lower grades (although not equal to that of English speaking students *within* NUSD), and increasing failures for older students, a significant majority of whom are failing the state's basic achievement tests.

Federal performance classifications under NCLB generally correspond with this portrait: In 2004-05, one of Nogales' two middle schools failed to meet its adequate yearly progress goals under NCLB, as did the alternative high school. In 2005-06, the same middle school was under a restructuring plan, and corrective action was being taken in the alternative high school. The main high school had been given a warning, as had a lower-performing elementary school.

In a survey of the test results of ELL students statewide, NUSD students' performance was also consistent with this general snapshot. This survey, commissioned by Arizona's Department of Education, reported the 2005 test results of students who were classified as ELL in 2003 and ranked schools by the average AIMS scores of these students.[25] Some, but not all, of NUSD's younger ELL students did very well. Four NUSD elementary schools ranked in the top ten schools in the state by this measure, with passage rates of over 70%. Two other elementary schools fared more poorly, ranking 41st and 152nd, with passage rates of about 60% and about 50%, respectively. Middle school performance was lower — one tied for 165th place, also with about a 50% passage rate, and the other ranked 409th, with only about 40% of its ELL students passing the test. The high schools are at the bottom of the heap. The main high school ranks 575th, with a 28.37% overall passage rate and Santa Cruz Alternative High School is four from the bottom at 625th place and a 8.62% passage rate.

Finally, there is at least one clear bright spot: For all grades in 2005-06, *reclassified* ELL students were doing about as well as native English speakers, which is a notable accomplishment, and which suggests that the ELL programs may well benefit those who successfully transition out of them. But, as the data on such scores does not track individual students, showing when they passed through ELL programs and

---

[25] No effort was made to verify that a given student was still ELL or that he or she had remained in ELL programming for the two intervening years. Nor are test scores available for these students in 2003. The result is that the survey data does not present a longitudinal survey of the progress of students who remained in ELL programs for that period. Nor is the data of value in demonstrating that NUSD's ELL students are doing better relative to non-ELL students, as non-ELL students' performance was not measured or ranked. More importantly, if, as Flores alleges, Arizona systematically underfunds ELL programs statewide, comparing one allegedly underfunded district with another does not show that funding in any given district is adequate.

how long it took them to do so, and because the reclassification methodology continues to shift, this bright spot does not offset the otherwise troubling ELL test data. On the data available, it is possible that some high achievers may rapidly be leaving ELL programs while other students continue to struggle, never achieving at the same levels as non-ELL students. Indeed, Dr. Zamudio testified that reclassification in NUSD takes, *on average*, four to five years and the district court so found. The encouraging success of reclassified students is therefore of limited significance with regard to the overall impact of NUSD's ELL program.

### b.   Funding

NUSD estimates its per pupil incremental costs for ELL programming for the 2005-06 school year at $1570.42, over three times the Group B level weight funding Arizona provides for ELL programs under either HB 2010 or HB 2064. NUSD has been able to finance the improvements it has made by seeking grants, diverting state base level funding away from other purposes, and passing county-level budget overrides.

Of the $1570.42 per pupil that NUSD indicates it spends on ELL programming, over half this amount, $824.25, is drawn from the district's maintenance and operations account (which includes both the ELL Group B funds and base level support funding). As this amount is well above the Group B weights, it indicates that NUSD is dipping into funds that would otherwise be used to fund basic educational purposes. Federal funds add about $484.05 per student, but most of these funds are earmarked for at-risk, low-income students, rather than ELL students (although the two groups overlap). Another $43.43 per student comes from county override funds. The remaining $218.69 per student comes from a variety of state, federal, and local funding sources and grants.

NUSD's budget has increased over the years, but ELL-specific funds have been a relatively small part of that

increase. A schematic break-down of the budget over the relevant period, which does not appear to include the relatively small amount of funding from the county, was entered into evidence before the district court. We reproduce a somewhat modified version of that table here. The break-down shows *all* funds available to ELL students, including funds that are not ELL-specific. ELL-specific funding sources are labeled as such, and the total amount of ELL-specific funding is separately recorded:

| | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 | 2005-2006 | 2006-2007 |
|---|---|---|---|---|---|---|---|---|
| **Base level state funds** | $2,592 | $2,618 | $2,721 | $2,788 | $2,858 | $2,929 | $3,039 | $3,173 |
| **Group B ELL funds** | $156 | $157 | $163 | $321 | $329 | $337 | $349 | $444[26] |
| **Other state ELL funds** | $0 | $0 | $0 | $126 | $83 | $64 | $0 | $74 |
| **Federal Title I funds** | $439 | $448 | $467 | $449 | $487 | $638 | $603 | $597 |
| **Federal Title II funds** | $58 | $63 | $74 | $101 | $109 | $91 | $92 | $87 |

---

[26]This amount is based on HB 2064's Group B weight increase. If that portion of HB 2064 does not go into effect, the figure will be $364.86.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Federal Title III (ELL) funds** | $0 | $0 | $0 | $67 | $89 | $114 | $118 | $121 |
| **Other state and federal grants** | $58 | $56 | $59 | $47 | $207 | $214 | $205 | $109 |
| **Total of all funds** | $3,302 | $3,342 | $3,484 | $3,899 | $4,162 | $4,387 | $4,406 | $4,605 |
| **Total ELL funds** | $156 | $157 | $163 | $514 | $501 | $515 | $467 | $639 |

In sum, as this table suggests, ELL-specific funds have never covered all ELL programming costs. NUSD can pay the incremental cost of its ELL programs only by diverting non-ELL-specific funds for that purpose, and the district was able to do that at the time of the Declaratory Judgment, as now. These ELL-specific funds, however, have increased, due largely to the rise in Group B weights occasioned by HB 2010 in 2002-03 and will increase again due to HB 2064 if the new Group B weight goes into effect. There remains, however, a fundamental mismatch between the ELL costs NUSD requires and the funds provided for that specific purpose.[27]

### c. Conditions in Other Districts

NUSD's reported incremental costs for ELL programming, and its need to divert other funds to cover them, are generally consistent with the experiences of districts across Arizona.

---

[27]We note that, for a variety of contractual and statutory reasons, and to ensure a fiscal cushion, NUSD carries over some portion of its budget every year, including some funds that it might otherwise spend on ELL programming or other needs. That practice, rooted in careful fiscal planning, does not indicate a surplus of funds for educational needs.

District officials testifying at the hearing reported incremental costs ranging from $1,077 per student to $4,072 per student. All of these districts are funding their programs by diverting funds from other sources, often by using additional taxes that they are allowed to levy for use in desegregation programs.[28] Group B weights, alone, are not generally sufficient to fund ELL programs.

Testimony from officials in other districts confirms that reclassification regularly takes longer than two years for many students. The average reclassification time in the Tucson Unified School District, for instance, is 4.6 years. In the Murphy Elementary School District, nearly two-thirds of ELL students took more than four years to be reclassified. Similarly, in the Scottsdale Unified School District, the majority of ELL students take more than two years to be reclassified, and in the Glendale Union High School District, 46% of ELL students at one school and 15% of ELL students at another had been in ELL programs for more than two years. No district submitted evidence showing that all of its ELL students had been reclassified within two years.

## G.   The Ruling on Remand

After the evidentiary hearing at which the facts concerning the current status of ELL students and ELL funding were presented, the district court again denied relief from judgment. *Flores v. Arizona*, 480 F. Supp. 2d 1157, 1167 (“*Flores XI*”) (D. Ariz. 2007).

---

[28]A broader survey of school district officials conducted for Flores by Dr. Chuck Essigs of the Arizona Association of School Business Officials yielded similar results. Dr. Essigs did not independently verify his survey results or ensure that responding districts used a common cost reporting system. As these results vary widely (from $351 to $3,874), neither we nor the district court rely much upon them. It is worth noting, nonetheless, that, for the fourteen surveyed districts with over 1,000 ELL students, incremental costs in 2006-07 in all but one were above $1,000, with most of the districts’ incremental costs in the range between $1,000 and $2,000.

The court held that the improvements at NUSD do not establish that Arizona is fulfilling its duty to fund ELL programming rationally. *Id.* at 1160, 1166. Most of these improvements, the court found, are due to NUSD's own management improvements, not to reliable or sufficient funding. *Id.* at 1160. And the improvements are limited: NUSD's ELL high school students, in particular, are still falling well behind its non-ELL students, and even the successes will be "fleeting at best" unless Arizona meets its funding obligations. *Id.* Thus, although NUSD is "doing substantially better," *id.*, and the state has developed a significantly improved infrastructure for ELL programming, "mere amelioration of those specific conditions" cited as examples of the funding shortage in the Declaratory Judgment, is "inadequate" to justify relief: "Rather, compliance would require a funding system that rationally relates funding available to the actual costs of all elements of ELL instruction." *Id.* at 1165.

The district court went on to determine that the Superintendent and the Legislative Intervenors had not demonstrated that such a system was in place. The court decided that HB 2064 does not sufficiently address the inadequacies of Arizona's ELL funding system and, in fact, introduces new problems. In so holding, the district court reasoned as follows: HB 2064's increase in Group B weights is inadequate, as "the per-student incremental cost of providing ELL instruction is greater than either the current Group B weight of $365 [set by HB 2010] or the increased weight of $444 that would be provided if [the c]ourt approved HB 2064, both in NUSD and in other districts." *Id.* at 1162. HB 2064's two-year cut-off of that funding would suddenly, and irrationally, further underfund school districts. *Id.* at 1166. The HB 2064 grant programs, which might have linked funding rationally to costs, are no better. The Arizona structured English immersion fund suffers from the same irrational two-year cut-off, *id.* at 1163, and both it and the compensatory instruction fund violate provisions of federal law that bar taking federal funds into account in mak-

ing state funding decisions and bar supplanting existing state funding with federal monies. *Id.* at 1166.

The district court concluded that, without a rational funding system for ELL incremental costs, Arizona remains out of compliance with the EEOA, despite some successes in NUSD:

> On January 24, 2000, this Court held that the State's minimum funding level for ELL programs was arbitrary and capricious and bore no rational relation to the actual funding needed to insure that ELL students could achieve mastery of the State's academic standards. . . . More than 7 years later, circumstances in this regard remain the same. The Moving Parties have not shown compliance with this Court's decree, much less changed circumstances that would warrant modification or dissolution of this Court's order.

*Id.* at 1167. The district court gave Arizona until the end of the then-current legislative session to comply. *Id.* The Legislative Intervenors and the Superintendent timely appealed.[29]

---

[29]After Arizona failed to comply with the district court's order in *Flores XI*, the court again found the state to be in contempt on October 10, 2007. *See Flores v. Arizona*, No. CV-92-596 ("*Flores XII*")(D. Ariz. 2007). The present compliance deadline is March 4, 2008. *Id.* at 4. The contempt order has been separately appealed and is not before us. We do, however, discuss it below in Part II(C)(2) for the light it sheds on the adequacy of HB 2064.

**Volume 2 of 2**

## II.  ANALYSIS

### A.  Standard of Review and Jurisdiction

Rule 60(b)(5) provides that "[o]n motion and just terms, the court may relieve a party . . . from a final judgment . . . [when] the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."[30]

The first two circumstances do not obtain here: Although the moving parties argue that Arizona has achieved the purposes of the judgment through actions other than those required by the Declaratory Judgment and the ensuing orders, Arizona has in fact not "satisfied" the prior judgment, as it has not complied with its terms. And there is no pertinent earlier judgment that has been reversed or vacated. Instead, the moving parties are, in practical terms, contending that it "is no longer equitable" to apply the judgment and the present injunction prospectively.

It is appropriate to grant a Rule 60(b)(5) motion for this reason when "the party seeking relief from an injunction or consent decree [meets its initial burden by showing] 'a signif-

---

[30]Amendments to the Federal Rules of Civil Procedure designed to clarify but not to make any substantive changes became effective on December 1, 2007. *See* Joseph Kimble, *Guiding Principles for Restyling the Federal Rules of Civil Procedure (Part I)*, 84 MICH. BAR J 56 (Sept. 2005). We quote the current version of the rule, although the district court ruled based on the prior version. The prior version provided that:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding [if] . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

We find no relevant distinction between the two formulations.

icant change either in factual conditions or in law.' " *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)); *see also Bellevue Manor Assoc. v. United States*, 165 F.3d 1249, 1255 (9th Cir. 1999) ("*Rufo* sets forth a general, flexible standard for all petitions brought under the equity provision of Rule 60(b)(5)."). Once that showing is made, modification may be warranted "when changed factual conditions make compliance with [a consent decree or an injunction] substantially more onerous," when a decree or injunction "proves to be unworkable because of unforeseen obstacles[,] or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384 (citations omitted); *see also SEC v. Coldicutt*, 258 F.3d 939, 941-42 (9th Cir. 2001) (using this standard). Finally, modification is necessary if a consent decree or injunction "become[s] impermissible under federal law." *Rufo*, 502 U.S. at 388; *see also Agostini*, 521 U.S. at 215 (same).

We review district courts' rulings on motions for relief from judgment under Rule 60(b) for abuse of discretion. *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005). "We may not reverse a district court's exercise of its discretion unless we have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors." *Coldicutt*, 258 F.3d at 941. In this context, "[a] district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Asarco*, 430 F.3d at 978.

We emphasize that our task in this context is a limited one: We do not sit to retry the case, nor to reexamine unappealed legal determinations, and do not have jurisdiction to do so. "[T]he timely filing of a notice of appeal in a civil case is a jurisdictional requirement," *Bowles v. Russell*, 127 S. Ct. 2360, 2366 (2007), and "[b]ecause the time for appeal ha[s] passed in this case, the interest in finality must be given great

weight." *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981). We have cautioned against the use of provisions of Rule 60(b) to circumvent the strong public interest in timeliness and finality served by Rule 4(a). *See In re Stein*, 197 F.3d 421, 425-26 (9th Cir. 1999). Simply put, motions for relief from judgment may not be used to remedy a failure to contest in the first instance the legal rulings underlying the judgment itself.[31]

Our review is somewhat closer in the context of institutional injunctions against states "due to federalism concerns" implicated by such injunctions. *Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397, 1402 (9th Cir. 1997). In such contexts, "[w]e scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law." *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995); *see also Hook*, 107 F.3d at 1402. Nonetheless, "we will defer to the district court so long as any injunctive relief it provides remains within these parameters," *Clark*, 60 F.3d at 604, and the burden of proof remains on the moving party. *Hook*, 107 F.3d at 1402; *Rufo*, 502 U.S. at 383-84. Additionally, federalism concerns

---

[31]The Legislative Intervenors cite to a pre-*Agostini* Sixth Circuit case, *In re Detroit Auto Dealers Ass'n, Inc.*, 84 F.3d 787, 790 (6th Cir. 1996) for the proposition that a "party should be entitled to modification whenever the original decree could not properly have been issued on the state of facts that now exists." This sentence, in turn, is drawn from a decades-old student note, *Developments in the Law — Injunctions*, 78 HARV. L. REV. 994, 1082 (1965), which was prescribing changes in the then-current law, not describing the state of the law.

To comport with modern law, and particularly with the final nature of unappealed judgments, the language must be read to mean that relief is appropriate when the "original decree could not properly have been issued on the state of facts that now exists *applying the legal framework used by the original unappealed judgment*." Otherwise, such a rule would invite relitigation of settled judgments using Rule 60(b) as a vehicle, a use which, as noted, is improper.

are substantially lessened here, as the state of Arizona and the state Board of Education wish the injunction to remain in place.

The Superintendent and Legislative Intervenors also question the district court's compliance with our mandate on remand and the propriety of several evidentiary rulings. "This court reviews de novo a district court's compliance with the mandate of an appellate court." *United States v. Perez*, 475 F.3d 1110, 1112 (9th Cir. 2007) (citations and alterations omitted). With exceptions not pertinent here, "we generally review the district court's ruling on a motion *in limine* only for an abuse of discretion." *United States v. Ross*, 206 F.3d 896, 898 (9th Cir. 2000).

Finally, the parties dispute each others' standing. The Legislative Intervenors, first, contend that Flores lacks standing to argue that HB 2064 does not represent a change in circumstances sufficient to warrant relief. The Legislative Intervenors are wrong: HB 2064 holds itself out as a remedy for Flores and was presented to the court by Arizona and by the Superintendent and Legislative Intervenors as such. Whether or not Flores would have had standing to challenge HB 2064 in the first instance, she certainly has standing to argue that a purported remedy will not satisfy a judgment in her favor.

Second, Flores challenges the standing of the Superintendent because he does not make the funding decisions at the core of this case. As to that basis for disputing the Superintendent's standing, Flores is wrong. The Superintendent does not, it is true, write school funding laws, but he does administer the state's education system, including the HB 2064 grant system, *see* Ariz. Rev. Stat. § 15-251, and obviously has a vital interest in whether or not funding for the programs he oversees is EEOA compliant. He is a named defendant in the case; the Declaratory Judgment held him to be in violation of the EEOA, *Flores II*, 172 F. Supp. 2d at 1239-40, and the cur-

rent injunction runs against him.[32] That judgment against him may not be essential to relief does not mean that he lacks standing to contest an order running against him.

The Superintendent's standing is, however, for a different reason, fairly tenuous. He is "[s]ubject to supervision by the state board of education" with regard to distributing monies to local schools, and must "[e]xecute, under the direction of the state board of education, the policies which have been decided upon by the state [B]oard." ARIZ. REV. STAT. § 15-251(3), (5). It appears that the Superintendent, by filing the motion to vacate the judgment, by pursuing this appeal, by maintaining that ELL-specific funding does not matter to the success of ELL education in Arizona, and by seeking to derail any additional ELL-specific funding in Arizona, is not carrying out "the policies which have been decided upon by the state board," which this litigation suggests are directly to the contrary in all regards. Moreover, the Superintendent's standing is limited to defending against the judgment and injunction as they run against him. The other defendants are not seeking relief from the judgment and orders, and the judgment and orders against the remaining defendants can be given full effect without running against the Superintendent, as the state Board of Education can order him to comply.

The state Board of Education, however, is obviously fully aware of the actions the Superintendent has taken in this litigation. There has been no suggestion that it has ordered him to drop his motion or this appeal, or to conform his position to that of the board, although it may well be that it could do so. Given that vacuum, we have no basis for determining on the present record that the Superintendent is acting outside his

---

[32]That the injunction may be enforced against the Superintendent is indicated by the current civil contempt order which orders him to "use [his] best efforts within the power granted to [him] . . . to ensure compliance with the March 22, 2007 Order [*Flores XI*] by March 4, 2008." *Flores XII*, No. CV-92-596 (D. Ariz. October 10, 2007).

authority in bringing his motion and pursuing this appeal. We will not substitute our judgment for that of the state Board, which better knows its own policy determinations and can choose when to exercise its supervisory authority. We do observe, however, that the current structure of this litigation is placing the federal judiciary in the uncomfortable position of mediating between state officials with regard to the execution of an obligation of the state as a whole. It would be vastly preferable for the state to work out through its own political structure a consistent position and approach.

Despite these concerns and although the issue is exceedingly close, we conclude that the Superintendent does have standing to maintain his Rule 60(b)(5) motion and this appeal, but note that the result had he succeeded would have been to vacate the judgment and injunction only as they run against him.

Third, Flores challenges the standing of the two Legislative Intervenors, as they speak only for themselves and do not represent the legislature as a whole, have no judgment against them, and no apparent direct interest in the judgment outside of an abstract policy interest. We need not decide this question, although the extent and degree of the standing of individual legislators under these circumstances is in very serious question. *See Raines v. Byrd*, 521 U.S. 811, 829 (1997). Parties need not have standing to intervene in our circuit, *see State of California Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 846 n.9 (9th Cir. 2003), although they must have standing to appeal, *see Diamond v. Charles*, 476 U.S. 59, 68 (1986). Because the Superintendent does have standing and also appealed, we would not lose jurisdiction over this appeal even if the Legislative Intervenors did not have standing.

## B.   Evidentiary Issues

Preliminarily, we briefly address evidentiary issues arising from the hearing. The Legislative Intervenors contend that the

district court erred by admitting (1) evidence of ELL costs outside NUSD; (2) evidence of non-incremental costs; (3) the testimony of Flores' expert on federal education funding law; and (4) the NCSL study, the Staffers' study, and Dr. Essigs' study. We find no abuses of discretion.

**[1]** First, because Arizona never complied with the district court's earlier orders to prepare and adopt a cost study, the district court was right to look to whatever reliable evidence of ELL programming costs was available so as to better understand and assess the costs in NUSD. The experiences of other districts help to establish what incremental costs for ELL programs are likely to be, the variability in those costs, and various ways of delivering the programs. Admitting such evidence was not an abuse of discretion.

**[2]** Likewise, we find no abuse of discretion with regard to admitting evidence of "non-incremental" costs. The Legislative Intervenors contend that some of the costs identified by NUSD and other districts do not fit within HB 2064's definition of "incremental costs." It is not at all clear why that particular definition should control at the hearing, as HB 2064's adequacy as a whole was and is in question. In any event, although the Legislative Intervenors may disagree about how costs were measured, they had ample opportunity to challenge cost figures at the hearing, and took that opportunity.

**[3]** Third, we find no abuse of discretion with regard to the expert testimony on federal educational funding law. It is true that "matters of law" are generally inappropriate subjects for expert testimony, *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992), but there may be "instances in rare, highly complex and technical matters where a trial judge, utilizing limited and controlled mechanisms, and as a matter of trial management, permits some testimony seemingly at variance with the general rule." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 101 (1st Cir. 1997). In this hearing, which was, in large part, an inquiry

into education law and policy, the expert testimony may well have been helpful. It was, in any event, not prejudicial in this bench trial, where there was no danger that a jury might give too much credence to a legal expert. *See id.* at 99.

**[4]** Finally, we find no abuse of discretion with regard to the admission of the three cost studies.[33] The NCSL study, conducted by an expert research agency and based on expert opinion is certainly not unreliable under the standards set by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and extended by *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). To the extent that one portion of the study — its survey of Arizona schools — had a low response rate, the study notes the deficiency and cautions against giving that portion too much weight. There was no error in admitting it.

The Staffers' study, which was prepared as a partisan advocacy document by non-experts, and Dr. Essigs' survey, which did not use any form of verification and appears to have been an entirely informal email survey, are more questionable. But even if there was error here, the Legislative Intervenors were not prejudiced. As a general matter, "in a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial." *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994). So, too, for potentially unreliable evidence. Given that the two studies are largely duplicative of other properly admitted evidence, and given the facial deficiencies of HB 2064, we cannot say that the outcome of the hearing would have been any different had the two studies not been admitted. There is no reversible error here, so we turn to the merits.

---

[33]Flores argues that two of the studies are admissible under the public records exception to the hearsay rule, Fed. R. Evid. 803(8). That point is not clear, but we do not decide the question, as there was no prejudice resulting from their admission.

## C. Is Relief from Judgment Warranted?

This case is unusual in that the Superintendent and Legislative Intervenors (1) did not appeal from the original judgment holding that Arizona's funding system for ELL programs was in violation of the EEOA; (2) did not appeal from the injunctions issued to remedy that violation; and (3) argue only in the alternative that HB 2064, which defines Arizona's ELL funding system, demonstrates actual compliance with the Declaratory Judgment and so warrants relief. The Legislative Intervenors maintain that Arizona is in compliance "with or without" HB 2064, and the Superintendent similarly maintains that the statute is "irrelevant."

As to the third point, both the Superintendent and the Legislative Intervenors argue that the district court should not have considered HB 2064's legality on remand.[34] They instead primarily argue that neither we, nor the district court, need look to HB 2064 at all. In their view, conditions have so changed as to make the Declaratory Judgment's emphasis on developing a cost-linked ELL funding structure irrelevant and so render it inequitable to require the state to do so.

Our previous Rule 60(b) cases generally deal with requests for modification due to changed circumstances that rendered compliance more onerous, *see Asarco*, 430 F.3d at 975-76; *Bellevue Manor Assoc.*, 165 F.3d at 1250-52, or due to actual compliance, *see Coldicutt*, 258 F.3d at 941-43. The moving parties here, instead, urge us to look away from Arizona's attempt to comply — HB 2064 — and turn instead to other factors — a generalized increase in state funding, changes in the management of NUSD, and passage of the No Child Left Behind Act of 2001. These changes, they urge, sweep away the foundations of the prior rulings and so justify relief from them.

---

[34]In contrast, their original motion for relief from judgment relied heavily upon HB 2064 as grounds for relief.

As a general matter, there are some instances, likely rare, in which a prior judgment is so undermined by later circumstances as to render its continued enforcement inequitable even though neither appealed nor complied with. *See, e.g., Rufo*, 502 U.S. at 383-85. Such circumstances are not present here, however, nor do we think it proper to reward Arizona's foot-dragging by granting relief from judgment on grounds that could have been raised on appeal from the Declaratory Judgment and from earlier injunctive orders but were not. Further, HB 2064 is among the most significant changes in ELL education and finance in the state since the Declaratory Judgment issued and so must be examined to determine whether it constitutes compliance with the district court's orders.

We now discuss the arguments for relief in turn, beginning with the novel proposition that the judgment need no longer be complied with and then turning to whether Arizona *has* complied.

### 1. Whether Compliance is Still Equitable

The core premise of the Declaratory Judgment is that Arizona is "violating the EEOA because [its] arbitrary and capricious *Lau* appropriation is not reasonably calculated to effectively implement the *Lau* educational theory which it approved, and NUSD adopted." *Flores II*, 172 F. Supp. 2d at 1239. The central idea, then, is that ELL programs impose costs additional to those generated by ordinary school activities, *id*. ("The State's minimum base level for funding *Lau* programs . . . . bears no relation to the actual funding needed. . . ."), and that, in the absence of such state support, ELL programs would necessarily be inadequate.[35] The district court

---

[35]That premise has been repeated and amplified in a host of similarly unappealed post-judgment relief orders. *See, e.g.*, *Flores VII*, No. CV-92-596 at 5 (D.Ariz. January 28, 2005); *Flores VI*, No. CV-92-596 at 2 (D. Ariz. June 12, 2002); *Flores III*, 160 F.Supp. 2d at 1044.

listed six deficiencies generated by inadequate resources in 2000. Because many of these specific problems have been solved by better management in NUSD, and because school funding has generally increased, the Superintendent and Legislative Intervenors argue that the judgment has effectively been satisfied.[36] We review these arguments; it is not, however, our task to retry the case. The district court should be affirmed unless it has clearly erred on the record before it in its factual findings or otherwise has abused its discretion.

NUSD should not be penalized for doing its best to make do, despite Arizona's failure to comply with the terms of the judgment. Granting relief would absolve the state from providing adequate ELL incremental funding as required by the judgment. The judgment determined that the state has not provided adequate resources to support NUSD's ELL programming, as required by the EEOA. We cannot now decide anew the unappealed Declaratory Judgment, nor the many post-judgment orders so holding. As we have explained, the provisions of Rule 60(b) may not be applied to "derogate from the purpose and effect of Rule 4(a)." *In re Stein*, 197 F.3d at 425. The legal determinations made in the Declaratory Judgment were unappealed and are now final.

Underlying the Declaratory Judgment and post-judgment orders is the basic determination under the EEOA that, given

---

[36]The Superintendent and Legislative Intervenors also argue that NUSD must have solved its problems because district officials signed a federal grant application that contains a boilerplate assurance that it is in compliance with all state and federal laws and regulations. First, whether NUSD is in compliance is not the issue; NUSD is not a defendant. Arizona is, so the question is whether *Arizona* is in compliance. It is true that the state also submitted a rote assurance of compliance with federal law (although no party relies upon it), but we cannot say that the district court was obliged to accept such boilerplate, generalized statements as true, or that the unsubstantiated statements make the district court's considered determination that NUSD still has problems, based on district-specific data, clear error.

Arizona's educational funding structure, ELL programs require substantial state funding in addition to that spent on basic educational programming. That conclusion rests, in turn, on the recognition that ELL students require additional attention to bring their language skills to the point where they can fully benefit from instruction in English.

To prevail on their argument, then, the Superintendent and Legislative Intervenors needed to show either that the basic factual premises of the district court's central incremental funding determination had been swept away, or that there has been some *change* in the legal landscape that makes the original ruling now improper. It will not suffice to argue for vacating the judgment because of factual or legal circumstances that have not changed the basic premises of the original rulings.

### a.   Changes in Fact

**[5]** We begin with the moving parties' attempt to make the first, fact-based showing — that the factual circumstances have so shifted as to sweep away the unappealed incremental funding determination. To succeed on this ground, given the original ruling, they were required to demonstrate either that there are no longer incremental costs associated with ELL programs in Arizona or that Arizona's "base plus incremental costs" educational funding model was so altered that focusing on ELL-specific incremental costs funding has become irrelevant and inequitable.

**[6]** Turning, then, to the first possibility, we cannot find that the district court clearly erred when it found, consistent with the basic premises of this litigation, that in 2007, as in 2000, "ELL students need extra help and that costs extra money." *Flores XI*, 480 F. Supp. 2d at 1161. At the evidentiary hearing, all witnesses agreed that ELL students face unique challenges which require school districts to invest substantially in teacher training, materials, monitoring, and

assessment efforts. If anything, after 2000, when Arizona moved away from bilingual education and required most courses to be taught in English, regardless of students' language abilities, these challenges have become greater: A tenth grader, for example, who speaks no English but must pass a biology course taught entirely in English will require considerable assistance. The recent statewide program to improve ELL testing, monitoring, and support programs also imposes incremental costs on school districts.

[7] Nor did the district court err when it determined that "the per-student incremental cost of providing ELL instruction is greater than either the current Group B weight" of about $340 per student or the roughly $450 per student that would be provided were HB 2064's provision on Group B weights to be approved. *Id.* at 1162. As the Superintendent and Legislative Intervenors observe, Superintendent Cooper's management changes did ameliorate many of the specific examples of resource shortages that the district court identified in 2000. They did not, however, result in such success as to call into serious question NUSD's need for increased incremental funds. NUSD's own cost study, along with evidence from other districts throughout Arizona, placed estimated incremental costs at well over $1000 per student. The expert panels consulted in the NCSL study similarly recommended spending over $1000 per student, and, in some cases, recommended spending over $2000 per student. The NCSL's school district survey reported *actual* per student spending as in the $600 range but cautioned that that figure might be an underestimate. The SjobergEvashnek study reported that actual expenditures in NUSD shortly after the Declaratory Judgment were in the $300 per student range but also noted that its estimate was likely low. Taken together, these studies provide very strong support for the proposition that the incremental costs of a compliant program not only exceed the Group B weights, either as presently set or as provided by HB 2064, as

the district court concluded, but in fact likely exceed $1,000 per student, both in Nogales and statewide.[37]

The Superintendent and Legislative Intervenors nonetheless maintain that the improvements in ELL achievement in NUSD demonstrate that additional incremental funding is no longer required. To the contrary, the data from NUSD supports our conclusion that the district court did not abuse its discretion in holding otherwise.

As Dr. Zamudio testified, resource constraints remain: NUSD *still* cannot afford to pay market rate salaries to attract the teachers it needs to reduce class sizes to levels more conducive to ELL education, nor can it hire qualified teacher's aides for the lower grades. That these constraints matter is apparent from the persistent achievement gaps documented in NUSD's AIMS test data. As we discussed at length above, ELL students in NUSD continue to fall behind their native-English-speaking counterparts, both statewide and within the district. These gaps grow in the higher grades, as the district court found, and are disturbingly large. Although, as we have noted, the data is limited, the burden here is on the moving parties to prove the factual changes on which they premise their motion to vacate the judgment. *See Asarco*, 430 F.3d at 979. We cannot say that the district court clearly erred when it found this burden was not met. A district in which the *majority* of ELL tenth graders fail to meet state achievement standards while the majority of native English speakers pass is not one whose performance demonstrates that the state is

---

[37]Arizona's ineffectiveness in ascertaining costs has made the question of costs more difficult to answer than it might have been. Because the state's efforts to gather cost study data were incomplete — the SjobergEvashnek study was inconclusive and the NCSL study was repudiated by the legislature, *see* HB 2064 § 13(C) — the precise incremental costs of ELL programming are not known and we and the district court must rely on what evidence is in the record from the various cost studies and from NUSD and other districts.

adequately funding ELL programs and so warrants relief from judgment.[38]

The Superintendent and Legislative Intervenors respond, essentially, that even if ELL programming costs do exceed ELL-specific funding, there is ample state funding to cover them. They argue, in other words, that focusing solely on ELL-specific funding, and on the Group B weights in particular, is no longer appropriate given general increases in education funding since 2000.[39] Such a focus, they contend, mistakes "the details, even the minutiae, of the intermediate methodologies the court has devised" to reach compliance for compliance itself. *Glover v. Johnson*, 138 F.3d 229, 233 (6th Cir. 1998).[40] With this argument, the Superintendent and Leg-

---

[38]That *reclassified* students in the 2005-06 school year do about as well as native English speakers, however, is encouraging, and may suggest some degree of success, as does the increase in reclassification rates in NUSD. But because the reclassification standard has repeatedly changed and because the record indicates that reclassification takes many years, the record does not demonstrate that NUSD is succeeding in rapidly and permanently reclassifying ELL students, nor on the time it takes to reclassify students. On the current record, we certainly cannot say that the encouraging data on the scores of reclassified students and on reclassification rates is sufficient to have rendered the district court's findings clearly erroneous.

[39]They also point to the increased institutional support, such as new training and monitoring programs, now provided by the state. That support is of limited relevance, as the need to establish monitoring and training programs was set out in the *Flores* consent decree. That Arizona may have satisfied the decree, which dealt with issues not included in the Declaratory Judgment, does not mean that the Judgment has also been satisfied.

[40]In *Glover*, a district court overseeing an original judgment ordering parity in the treatment of prisoners regardless of gender was holding the defendants to finely-tuned compliance plans that specified, with great detail, conditions in the prisons. *Id.* at 233-36. The Sixth Circuit vacated a round of contempt sanctions arising from violations of these plans, emphasizing that the goals of the underlying judgment were simply to fix the underlying gender discrimination and end judicial involvement and warning against "judicial micromanagement." *Id.* at 241, 245. As we develop, *infra*, such micromanagement is not at issue here.

islative Intervenors seek to reopen matters made final when the Declaratory Judgment was not appealed. The EEOA provides that states must not "deny equal educational opportunity . . . by . . . the failure by an educational agency to take *appropriate* action to overcome language barriers that impede equal participation." 20 U.S.C. § 1703(f) (emphasis added). Diverting base level funds — thereby hurting all students in an attempt to equalize opportunities for ELL students — is not an "appropriate" step. The district court recognized as much by holding that Arizona had not taken "appropriate" action to comply with the EEOA at *Castaneda* step two by failing to "set a minimum base funding level per [ELL] student" that was rationally related to costs, regardless of the base level funding provided for all students. *Flores II*, 172 F. Supp. 2d at 1239.

For eight years, Arizona has attempted to remedy *that* deficiency in ELL-specific funding, and for eight years the parties have litigated based upon that premise. Unlike in *Glover*, which repudiated the district court's excessive concern with specific compliance steps rather than with the core of its judgment, looking to the adequacy of ELL-specific funding does not miss the forest for the trees. It cuts to the heart of this case, which has been about such funding since 2000, when the parties dealt with the other issues in a consent decree. If the Superintendent and Legislative Intervenors believed that the district court erred and should have looked at all funding sources differently in its EEOA inquiry, they should have appealed the Declaratory Judgment. They may not now upend its basic legal conclusions.

**[8]** Nor have the fundamentals of the Arizona school funding system changed in any way that undermines the district court's original conclusion that incremental ELL funding is what matters for EEOA purposes. Accepting the Superintendent and Legislative Intervenors' argument would be to hold that the funding restrictions and categories used by Arizona are meaningless. As we have explained, Arizona allocates

ELL funding *on top* of base level support. HB 2010 and HB 2064 have followed this approach. This statutory scheme is still premised on the idea that ELL programming imposes costs *additional* to those covered by ordinary base level funding. Base level funds are still provided in block grants, as in 2000, and the grants are, as they were in 2000, unrestricted. And base level funding, although apparently not itself based on a clear cost accounting of educational needs, *see Roosevelt I*, 877 P.2d at 810, must still support most non-ELL educational costs. It is the base level funds that, if NUSD had no ELL students, would be spent on math, reading, writing, and other basic subjects. That funds for *both* basic educational support and ELL costs have increased does not indicate that the fundamental pattern has changed. In 2000, as today, ELL incremental costs *could* be covered by diverting basic educational support, hampering the state's ability to provide a basic education to all Arizona students. So, by underfunding ELL programs and forcing NUSD to dip into those base level funds, Arizona still forces it to choose between base level needs and ELL programs — which the district court refused to view as an answer to ELL funding in 2000, when the option was as available as it is now. That binding legal determination is not now subject to reconsideration.[41]

---

[41]Federal funds have also been taken out of the compliance calculus by the Declaratory Judgment. The district court understood EEOA compliance to be a state obligation and so ruled when, despite noting the presence of federal grants (which it doubted would be renewed), it held Arizona to be out of compliance with the EEOA for providing inadequate *state* funding and required *Arizona* to fund its ELL programs adequately. *Flores II*, 172 F. Supp. 2d at 1236, 1239. That unappealed determination still stands. Although federal funds have since increased, we do not find that this increased funding availability undermines the district court's basic legal determination that the EEOA obligation rests in the first instance with Arizona. Indeed, as we discuss below, federal education funding law is generally designed to layer federal funds on top of state education funding and to ensure that state funds are allocated without regard to federal funds.

Nor do circumstances in NUSD demonstrate that anything has happened to undermine the district court's conclusion in the original Declaratory Judgment that adequate levels of ELL-specific funding were critical to EEOA compliance. Ninety percent or more of NUSD students are either still in or have been in ELL programs. It is the *same* students who will suffer as the district shifts funding away from core educational needs to support ELL programs. When NUSD must choose to fund, say, required structured English immersion endorsements for its staff, rather than expanding its high school math or art offerings, all students will suffer, including ELL students, now as in 2000.

In short, the solution posited by the Superintendent and Legislative Intervenors— which the amici school districts and school boards in this case call a "Hobson's choice" — was rejected by the district court as a matter of law in the Declaratory Judgment when it based its holding on ELL-specific funding in general and the Group B weights in particular. Nothing significant has changed to undermine that ruling. Instead, the Superintendent and Legislative Intervenors are simply placing their suggested solution — spending less on basic education so as to have sufficient funds for ELL purposes — on the table after it was necessarily rejected in the unappealed judgment, which requires ELL-specific funding. That they may not do.

**[9]** There was no clear error in the district court's factual findings and no abuse of discretion in its legal conclusion that the landscape was not so radically changed as to justify relief from judgment without compliance.

### b. Changes in Law

The Superintendent and Legislative Intervenors also offer a legal change argument as to why the premises of the Declaratory Judgment have been so undermined as to justify relief from judgment despite noncompliance. They maintain that the

passage of NCLB — and, in particular its Title III, which focuses on ELL students — has in some fashion altered their obligations by making the *Castaneda v. Pickard* framework "obsolete," urging two points: First, that state compliance with NCLB benchmarks should be enough to satisfy the EEOA, and hence the judgment and, second, that NCLB obviates any need to do a state-wide cost study of ELL program incremental costs.

We are unpersuaded by the first, more important point. The Superintendent and Legislative Intervenors fail to appreciate the distinct purposes of the EEOA and NCLB: The first is an equality-based civil rights statute, while the second is a program for overall, gradual school improvement. Compliance with the latter may well not satisfy the former.[42]

**[10]** Title III of NCLB sets out to "help ensure that children who are limited English proficient . . . attain English proficiency . . . and meet the same challenging State academic content and student achievement standards as all children are expected to meet." 20 U.S.C. § 6812(1). To aid in this goal, it provides grants to states with federal government-approved plans to benefit ELL students. *See* 20 U.S.C. §§ 6821-26. To retain grant eligibility, grantees must meet "annual measurable achievement objectives . . . includ[ing] . . . making adequate yearly progress for limited English proficient children." *See* 20 U.S.C. § 6842.

These objectives include "at a minimum, annual increases in the number or percentage of children making progress in learning English," "at a minimum, annual increases in the

[42]We also note that NCLB became law on January 8, 2002, *see* 115 Stat. 1425, prior to the district court's compliance rulings on HB 2010, prior to the parties' previous appearance before this court in 2006, and more than five years prior to this appeal. It is now more than a little late to argue that NCLB effectively repeals the EEOA, and so justifies relief from the district court's judgment and orders. Any such change occurred well before the most recent orders were entered.

number or percentage of children attaining English proficiency by the end of each school year," and "making adequate yearly progress" in such children's academic achievement. 20 U.S.C. § 6842(a)(3)(A). Arizona defines these goals as "yearly growth in the fraction of students making progress towards English proficiency, those attaining English proficiency, and those students meeting/exceeding the AIMS objectives in order for Arizona to [meet the requirement that 100% of all students pass AIMS by] 2013-14." Arizona's School Accountability System Technical Manual: Volume III: Title III Accountability at 5 (2005). Specifically, school districts are required to increase the fraction of students making progress toward English proficiency or being reclassified as English proficient by a specified percentage each year.[43] Additionally, increases in reading and math proficiency are prescribed.[44] *Id.* at 5-11. Importantly, this very gradual improvement plan does not set as an objective immediate equalization of educational opportunities for each such student.

[11] NCLB, in other words, packages federal grants with discrete, incremental achievement standards as part of a general plan gradually to improve overall performance. It does not deal in the immediate, rights-based framework inherent in civil rights law, although it is intended to ameliorate over the longer haul the conditions that lead to civil rights violations. Perhaps recognizing as much, Title III of NCLB explicitly provides that "[n]othing in this part shall be construed in a manner inconsistent with any Federal law guaranteeing a civil right." 20 U.S.C. § 6847.

[12] The EEOA is just such a rights-enforcing law. It requires states "to ensure that needs of students with limited English language proficiency are addressed," *Idaho Migrant*

---

[43]In academic year 2003-04, a 10% increase was required. This requirement increases by one percentage point each year until 2011.

[44]This increase must equal roughly 10% every three years until 2010, at which point it must increase 10% per annum until 2014.

*Council v. Bd. of Educ.*, 647 F.2d 69, 71 (9th Cir. 1981), by requiring them to remove barriers to equal participation in educational programs now rather than later, and it provides students with a right of action to enable them to enforce their rights, *see* 20 U.S.C. § 1706; *Los Angeles NAACP v. Los Angeles Unified Sch. Dist.*, 714 F.2d 946, 950-51 (9th Cir. 1983). The EEOA's concerns, in other words, lie fundamentally with the current rights of individual students, while NCLB seeks gradually to improve their schools. An individual student whose needs are not being met under the EEOA need not wait for help just because, year after year, his school as a whole makes "adequate yearly progress" towards improving academic achievement overall, including for ELL students.

The position pressed by the Superintendent and the Legislative Intervenors — that state compliance with NCLB necessarily satisfies the EEOA[45] — cannot be squared with this understanding of the two statutes. In their view, NCLB now defines "appropriate action" under the EEOA, such that NCLB compliance is dispositive of EEOA compliance, regardless of whether incremental ELL funding is currently adequate to provide equal educational access to ELL students. But such an interpretation would, first, produce strange results: If a state happened to meet adequate yearly progress under NCLB one year, no suits could proceed under the EEOA, even if fundamental linguistic inequalities persisted in some or all of its schools, even if ELL financial resources were entirely inadequate, and even if the particular students bringing suit had not received adequate ELL assistance nor made any progress towards English language proficiency. Any meaningful ability to use the right of action under the EEOA would thus wink in and out of existence based upon the year-to-year vagaries of overall school test scores. The EEOA does not tolerate such ephemeral compliance. *See Cas-*

---

[45]We note that even if the state as a whole complies with NCLB, that does not mean that the individual district is in compliance.

*taneda*, 648 F.2d at 1010 (holding that a state violates the EEOA if even an adequately-funded program "fails, after being employed for a period of time sufficient to give the plan a legitimate trial"). The district court so held in the Declaratory Judgment. *Flores II*, 172 F. Supp. 2d at 1238.

**[13]** Our point, boiled down, is that the Superintendent's and Legislative Intervenors' view, if adopted, would effectively repeal the EEOA by replacing its equality-based framework with the gradual remedial framework of NCLB. Such a result is simply not consistent with the text of either the EEOA or NCLB. There is certainly no express repeal provision in NCLB. Quite to the contrary, NCLB contains a savings clause with regard to civil rights statutes.

**[14]** Nor did NCLB repeal the EEOA by implication. "[R]epeals by implication are not favored. . . . In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 549-50 (1974); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2532 (2007) (implied repeals are "not favored" and will only be inferred if "the later statute expressly contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have meaning at all") (internal quotations and alterations omitted). Such is not the case here. The goals of the two statutes are complementary, as the saving provision of NCLB for civil rights statutes indicates.

We also cannot agree with the Superintendent and the Legislative Intervenors that this is a case where "a precisely drawn, detailed statute pre-empts more general remedies." *Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 834 (1976). Such cases concern instances where Congress has provided a narrower remedy for a class of harms otherwise covered by an older and more general statute. *See id.* (collecting cases). We

have already discussed the quite different focuses of the two statutes. That Title III of NCLB operates in the same general substantive area as the EEOA is not enough for us to hold that the former was intended to replace the latter, particularly in light of explicit statutory language to the contrary.

Our analysis is further bolstered by the Supreme Court's similar analysis of a purported conflict between a civil rights statute and a general Spending Clause-based statutory grant program, like NCLB, in *Blessing v. Freestone*, 520 U.S. 329 (1997). In that case, the Court considered whether the remedial scheme of Title IV-D of the Social Security Act displaced a right of action under 42 U.S.C. § 1983. *Id.* at 339-40. The Court held that a statute like Title IV-D could displace § 1983 actions in only two ways: "[E]xpressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 341.

There is, as we have noted, no express repeal here. And implied repeals of the remedial displacement kind are very rare, as the Court recognized in *Blessing*. *Id.* at 346-47 (noting only two such instances with regard to § 1983); *see also Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981) (detailing such an instance where the "quite comprehensive enforcement mechanisms" of two federal pollution statutes rendered it "hard to believe" that Congress intended to preserve § 1983 remedy for problems covered by the statutes).

*Blessing* also explicated an additional reason why NCLB cannot supercede the EEOA: The EEOA provides an express private cause of action, while NCLB does not. In *Blessing* the Spending Clause statute's "enforcement scheme" was limited because it had "no private remedy — either judicial or administrative — through which aggrieved persons can seek redress." 520 U.S. at 348. The Court held that the substantive statute could not "close the door" on § 1983, because a "plain-

tiff's ability to invoke § 1983 cannot be defeated simply by the availability of administrative mechanisms to protect the plaintiff's interests." *Id.* at 347-48 (internal quotation and alteration omitted); *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("[I]n *all* of the cases in which [the Court has held that a general program did not preempt a § 1983 cause of action] . . .the statute at issue . . . *did not* provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated.") (emphases in original); *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 521 (1990) (no repeal where the programmatic statute "contain[ed] no comparable provision [compared to statutes in S*ea Clammers* and similar cases] for private judicial or administrative enforcement*"*); *Smith v. Barton*, 914 F.2d 1330, 1334 (9th Cir. 1990) ("[T]he doctrine of [*Sea Clammers*] only bars section 1983 claims that *could have been brought* under a separate federal statute which provides remedial devices sufficiently comprehensive to demonstrate a congressional intent to preclude section 1983 claims."); *cf. ASW v. Oregon*, 424 F.3d 970, 977 (9th Cir. 2005) (holding that even some statutes *with* administrative mechanisms to protect plaintiffs' rights cannot preclude § 1983); *Price v. City of Stockton*, 390 F.3d 1105, 1115 (9th Cir. 2004) (same).[46] Like the statute in *Blessing*, NCLB does not provide an explicit private enforcement scheme.[47] Applying the holding

---

[46]The Superintendent also argues that the NCLB should be used to "assist in the interpretation" of the requirements of the EEOA. If he meant only that NCLB compliance is somewhat probative of EEOA compliance, we would agree. He argues, however, that NCLB's statutory scheme "supplemented and defined" the EEOA's "appropriate action" requirement such that compliance with the former is also compliance with the latter. We have just explained why that proposition is not so, and casting it as an argument for modification rather than repeal makes no difference. *Defenders of Wildlife*, 127 S. Ct. at 2533 n.8 ("It does not matter whether this alteration is characterized as an amendment or a partial repeal.").

[47]Because we find the complementary nature of the EEOA and NCLB clear, and because we do not wish to rule on a matter not squarely before us, we do not decide whether NCLB affords an implied right of action, although we note that some courts have concluded that it does not. *See Alliance for Children, Inc. v. City of Detroit Public Sch.*, 475 F. Supp. 2d 655, 658 (E.D. Mich 2007) (collecting such cases).

of *Blessing* and similar cases, the existence of an explicit private enforcement mechanism in one statute but not the other strengthens our conclusion that NCLB did not "close the door," *Blessing*, 520 U.S. at 348, on suits such as this one.

The second argument in this vein made by the Superintendent and the Legislative Intervenors has more merit. That argument is that, after NCLB, an order to perform a statewide cost study of ELL program incremental costs, and fund accordingly, may not be entirely sensible. While such an order would not be an abuse of discretion, it is true that NCLB's monitoring protocols have encouraged the development of substantial district-by-district data. This data may make it easier, and more sensible, for a state like Arizona to tailor some amount of funding to the particular incremental costs associated with the ELL program in each district, rather than to provide a uniform ELL increment to all districts regardless of the distinct conditions in each district. It appears that the Arizona Constitution would permit some degree of such tailoring. *See Roosevelt I*, 877 P.2d at 814 ("[U]nits in 'general and uniform' state systems need not be exactly the same, identical, or equal."). That point, however, does not avail the Superintendent and Legislative Intervenors, as they did not move for such a limited modification of the judgment. Instead, they argued that the district court should simply grant complete relief from judgment.

**[15]** In sum, just as no changes in fact have eliminated the premises of the Declaratory Judgment, no changes in law have done so either. The motion for relief from judgment, then, depends on showing that Arizona is, in fact, in compliance. And that question, in turn, depends on HB 2064.

### 2.  HB 2064 and Actual Compliance

Perhaps recognizing the flaws in HB 2064, the Superintendent and Legislative Intervenors begin by arguing that the

legality of the statute should not have been considered. That issue, they contend, was "outside" of our mandate on remand.

**[16]** The contention makes no sense. HB 2064 was enacted as Arizona's effort to comply with the Declaratory Judgment and was so represented to the district court. That this characterization of HB 2064 is correct is indicated in the statute itself, which provides that it will not go fully into effect unless the district court approves the statute as in compliance with its orders. It would be very strange if, on remand, our mandate to survey relevant changes of circumstances excluded such an obvious change.

Certainly, no portion of our mandate forbade such consideration. "[A]lthough lower courts are obliged to execute the terms of a mandate, they are free as to anything not foreclosed by the mandate." *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000) (quotation omitted). We remanded for the district court to hold an evidentiary hearing and explicitly decided no other issue. The district court held such a hearing.[48] There is no further mandate issue in this case.[49]

---

[48]The Superintendent also argues that the district court generally disobeyed the mandate by not making adequate findings of fact and conclusions of law. We disagree. Although the Superintendent might wish that the district court had made different findings and conclusions, the district court nonetheless fulfilled its task sufficiently to satisfy the mandate.

[49]Nor are there problems of ripeness or of forum. True, as the Superintendent and Legislative Intervenors note, it is highly unusual for questions of state compliance with federal school funding law to come before a court in the first instance. The Department of Education has an extensive administrative hearing apparatus, 20 U.S.C. §§ 1234 *et seq.*, and such cases would ordinarily originate there. Here, however, HB 2064 was *presented* to the district court as a ground for relief from judgment, and on its face became fully effective only if approved by the district court. As part of its inquiry, the court necessarily had to determine whether, on its face, HB 2064 satisfied the requirements of federal law; if not, the problems it was designed to solve would only be exacerbated. Thus, there are no forum problems here and, as HB 2064 became effective immediately, save for the Group B weights, there is no ripeness issue.

Proceeding to the merits of the HB 2064 issue, we hold that the district court's conclusions of law regarding the statute were not abuses of its discretion.[50] The court held that HB 2064's two-year funding cut-off was irrational, rendering it inadequate to comply with the judgment and that, in addition, several facial violations of federal law further compounded the statute's problems. *Flores XI*, 480 F. Supp. 2d at 1166. We agree.[51]

---

For similar reasons, the Legislative Intervenors' contention that the district court should have certified the question of HB 2064's interpretation to the Arizona Supreme Court is not well taken. They do not propound any substantial question of interpretation that would justify certification, instead only asserting generally that the statute might be "unclear." Yet, under Arizona law, a certification order must set forth "[t]he questions of law to be answered." ARIZ. REV. STAT. § 12-1863. Moreover, the argument was raised for the first time in their reply brief and such arguments are "generally deemed waived." *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006).

[50]Because the Superintendent and Legislative Intervenors argue that the district court should not have considered the legality of HB 2064 at all on remand, they do not directly argue that HB 2064 satisfies the judgment and so come close to waiving that argument entirely. But because they *do* argue in the alternative that the district court's decisions on HB 2064 were substantively wrong, they have preserved the issue, and we will consider it.

[51]Whether the district court could have declared Arizona to be in compliance immediately upon the passage of HB 2064 even if the law was facially appropriate is not entirely clear, although we do not decide the matter. Under the *Castaneda* framework adopted by the district court:

> If a school's program, although premised on a legitimate educational theory and implemented through the use of adequate techniques, fails, after being employed for a period of time sufficient to give the plan a legitimate trial, to produce results indicating that the language barriers confronting students are actually being overcome, that program may, at that point, no longer constitute appropriate action as far as that school is concerned.

*Castaneda*, 648 F.2d at 1010. HB 2064 itself suggested that the court might allow the statute to be implemented "on an interim basis . . . to determine whether the resulting ELL plans and available funding to implement the plans bear a rational relationship to the cost of implementing appropriate language acquisition programs." HB 2064 § 15(A).

**[17]** *First*, and most clearly, HB 2064's two-year funding cut-off alone renders the law inadequate as a funding scheme rationally grounded in the costs of providing ELL programs, as the district court held. *Flores XI*, 480 F. Supp. 2d at 1166. There is absolutely no evidence in the record to support the proposition that a student's need for ELL programs invariably vanishes after two years of instruction: Instead the evidence is squarely to the contrary, as all witnesses testified that some students would certainly take longer than two years to become proficient in English. Yet funding for both the Group B weights and the Arizona structured English immersion fund is unavailable after two years. *See* ARIZ. REV. STAT. §§ 15-756.01(J), HB 2064 § 6. All that remains thereafter is compensatory instruction funding, *see* ARIZ. REV. STAT. § 15-756.11, which cannot be used to support "normal classroom instruction." ARIZ. REV. STAT. § 15-756.11(G). To cut funding to children who have not yet learned English after two years of instruction, providing only for compensatory instruction — which cannot occur during class-time and so leaves the incremental costs of assistance for such children during the regular school day unfunded — cannot comply with the judgment. The district court did not abuse its discretion by holding HB 2064 inadequate in this regard.

*Second*, as we have discussed above, the district court did not clearly err in holding that HB 2064's Group B weight increase alone was not sufficient to meet the incremental costs of ELL programming. *Flores XI*, 480 F. Supp. 2d at 1162. The two grant programs created by HB 2064 might, however, be able to make up the gap between the incremental costs and the Group B weights, as the district court found, *id.*, and so these secondary programs become important to our analysis. It is, first, important to note that these grant programs will be of no significance at all unless they are funded and, as we have noted, the statute does not require that any appropriations be made for either program in coming years, although it does provide an initial appropriation for the compensatory

instruction fund. But even if the programs are funded, they do not well serve Arizona's effort at compliance.

Specifically, the district court held that HB 2064 cannot comply with the judgment because its grant programs violate several provisions of federal education funding law. *Id.* at 1166. Penalties for such violations include limitations on further grants and, in some cases, requirements that states pay back some or all of the grants they have already received. *See* 20 U.S.C. §§ 1234 *et seq.* If such violations are present, HB 2064 cannot be adequate relief. Its implementation would imperil federal funds for both non-ELL and ELL students.

**[18]** The clearest violation of federal law discussed by the district court is the state's violation of 20 U.S.C. § 7902, which, covering all of the pertinent federal grant programs, provides that "[a] State shall not take into consideration payments under this chapter (other than under subchapter VIII) in determining the eligibility of any local educational agency in that State for State aid, or the amount of State aid, with respect to free public education of children." The Declaratory Judgment in this case is directed at the funds distributed by the state to local educational agencies, so § 7902 is applicable. And HB 2064 manifestly requires that federal funds be considered with regard to distribution of funds from both the structured English immersion fund, *see* ARIZ. REV. STAT. §§ 15-756.01(I)(1)-(3), and the compensatory instruction fund, *see* ARIZ. REV. STAT. § 15-756.11(E).[52] HB 2064 therefore violates 20 U.S.C. § 7902 on its face.

The Legislative Intervenors offer only one counterargument on this point, which we do not find persuasive:

---

[52]The district court so held only with regard to the Arizona structured English immersion fund. Compensatory instruction fund monies, however, may not be allocated to "supplant any federal . . . monies . . . budgeted for [E]nglish language learners as of February 23, 2006." ARIZ. REV. STAT. § 15-756.11(E). That provision is therefore also in violation of federal law.

They suggest that "free public education," as used in 20 U.S.C. § 7902, is defined in relation to state law and that, under Arizona law, the term does not apply to ELL programs. So, they contend, 20 U.S.C. § 7902 does not apply to HB 2064's programs.

The federal definition of "free public education" is "education that is provided — (A) at public expense, under public supervision and direction, and without tuition charge; and (B) as elementary school or secondary school education as determined under applicable State law, except that the term does not include any education provided beyond grade 12." 20 U.S.C. § 7801(21). The provision relies only on state law to define "elementary or secondary school education," *not* "free public education," and thus defers to states with regard to which *grades* are embraced by the definition — not with regard to subject areas or services. That the "as determined under applicable State law" provision applies only to subsection (B) of the definition is indicated by the absence of a comma after "secondary school education;" by the existence of an "except" clause after the "as determined" phrase that pertains directly to subsection (B); and by the absurd results that would flow from the Superintendent and Legislative Intervenors' reading: Under their interpretation, states could define entire subjects or programs out of the federal funding statute's reach by changing their state definitions of "free public education."

[19] In any event, we find nothing in Arizona law to suggest that ELL programming is, in any sense, not part of a "free public education" in Arizona. The very existence of HB 2010 and HB 2064, and of the Group B weighting program, indicates otherwise.

[20] In sum, the district court did not abuse its discretion in concluding that HB 2064 does not constitute compliance.[53]

---

[53]The district court also held that HB 2064 facially violates the "supplement not supplant" provisions of many federal education funding statutes.

**[21]** We therefore affirm the district court's holding that HB 2064 does not warrant relief from judgment.[54] Indeed, to the extent that improved conditions in NUSD might somewhat support relief from judgment, HB 2064's flaws largely negate their import: The stark two-year cut-off it creates on all of Arizona's ELL funding (save for compensatory instruction funds which are no substitute for funding for day-to-day instruction) combined with the very real possibility that the funding scheme may trigger federal enforcement action, may well retard or reverse whatever progress has been made. So, to the extent that circumstances have changed after HB 2064,

*Flores XI*, 480 F. Supp. 2d at 1166. These provisions ensure that federal funds are truly additional to state funds by providing that federal efforts are to add to state programs, rather than simply replacing state funds with federal money without actually increasing existing efforts. *See Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 659 (1985) (discussing Title I "supplement not supplant" provision); *Dep't of Educ., State of Hawaii v. Bell*, 770 F.32 1409, 1413 (9th Cir. 1985) (same).

Because the two-year funding cut-off and the violation of 20 U.S.C. § 7902 each alone render HB 2064 insufficient to justify relief from judgment, we need not decide whether the district court correctly decided the "supplement not supplant" question, or whether, as the moving parties argue, it did so prematurely because the local educational entities have not yet spent any money. As we have explained, it is quite uncommon to confront whether a state funding statute complies with federal educational funding law in the first instance. *See* 20 U.S.C. §§ 1234 *et seq.*; *see also Bell v. New Jersey*, 461 U.S. 773, 791-92 (1983) (discussing the Department of Education's auditing process and holding that the "existence and amount of liability [under such provisions] are committed to the agency, in the first instance"). Doing so here was made necessary by the unusual circumstance that HB 2064's compliance with the Declaratory Judgment turns in part on such questions. But we need not decide more than is required. The somewhat more complicated issues raised by the "supplement not supplant" provisions are not necessary to our inquiry, so we do not decide them.

[54]Flores and Arizona argue that HB 2064 also violates federal law by requiring offsets of federal impact aid monies, *see generally* 20 U.S.C. §§ 7701 *et seq.*, and of school district desegregation monies. Because the district court addressed neither question, we do not reach these issues.

due to these two flaws they changed in large measure for the worse.

We note, however, that the district court has recently spoken again to this issue in its current contempt order, *Flores XII*, No. CV-92-596 (D. Ariz. Oct. 10, 2007), indicating that, despite HB 2064's flaws, Arizona may be nearing compliance. In that order, the court again noted the problems with HB 2064 that we have discussed but emphasized that, in its view, they could be cured by abandoning the two-year cut-off and by declining to consider federal funds in the grant-making process. *Id.* at 3-4. The model-based funding structure of the statute itself, the court held, was not at variance with the Declaratory Judgment, and the incremental costs data that districts are required to submit would, save for the flaws we have noted, enable Arizona "to rationally fund the new models for the ELL programs." *Id.* at 4.[55] There is reason, then, to hope, if the models are in fact funded and the two changes noted by the district court in its most recent order are made, that this dispute, which has been in the courts longer than it takes a student to go from kindergarten to college, may finally be nearing resolution.

## III.   CONCLUSION

[22] Arizona did not appeal the original judgment and has not complied with the Declaratory Judgment or with the bulk of the post-judgment relief orders. For all the reasons we have given, it is not inequitable to continue to require compliance. We therefore affirm the district court.

**AFFIRMED.**

---

[55]We do not, of course, express any view on the merits of the district court's contempt order, as it is not before us in this appeal.